**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 8, 2024

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 8, 2024

_Erin L. Lennon_
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| ALVIN GREENBERG, MICHAEL STEINBERG, JULIE HANSON, CHRISTINA KING, and RONNELL ROBERTSON, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>AMAZON.COM, INC.,<br><br>        Defendant. | No. 101858-4<br><br>En Banc<br><br><br>Filed: <u>August 8, 2024</u> |

WHITENER, J. — The United States District Court for the Western District of Washington asks this court to answer two certified questions about our Consumer Protection Act (CPA), chapter 19.86 RCW.

STANDARD OF REVIEW

"A federal court may certify a question of local law to the Washington Supreme Court when, in the federal court's opinion, 'it is necessary to ascertain the local law of this state in order to dispose of [a] proceeding [pending before the federal court] and the local law has not been clearly determined.'" *Kellogg v. Nat'l R.R. Passenger Corp.*, 199 Wn.2d 205, 215, 504 P.3d 796 (2022) (alterations in original) (quoting RCW 2.60.020). "Certified questions from federal court are

questions of law that we review de novo." *Carlsen v. Glob. Client Sols., LLC*, 171 Wn.2d 486, 493, 256 P.3d 321 (2011). "We consider the legal issues not in the abstract but based on the certified record provided by the federal court." *Id*.

CERTIFIED QUESTIONS PRESENTED

On October 22, 2021, Alvin Greenberg, Michael Steinberg, Julie Hanson, Christina King, and Ronnell Robertson (the plaintiffs) filed a first amended class action complaint in the United States District Court for the Western District of Washington. Clerk's Papers (CP) at 1-69. The plaintiffs alleged that Amazon violated the CPA "by charging consumers grossly inflated and thus 'unfair' prices during the COVID-19 pandemic." CP at 64. The plaintiffs also alleged that "[f]or purposes of this First Amended Complaint, … a price increase of 15% on any consumer good or food item after a declared emergency is 'unfair' for purposes of the []CPA." *Id*. Additionally, the plaintiffs alleged claims of negligence and unjust enrichment. CP at 66-68.

On December 3, Amazon moved to dismiss the first amended complaint under Fed. R. Civ. P. 12(b)(6). CP at 70. As to the CPA claim, Amazon argued that the plaintiffs failed to state a claim for relief because "price gouging" is not an unfair trade practice. CP at 85-95.

On April 4, 2023, the District Court entered an order certifying two questions to this court:

[1.] Does the Washington Consumer Protect Act's prohibition on "unfair" acts or practices comprehend a price gouging claim of the type alleged in the First Amended Complaint?

[2.] If yes, does the Court or the jury determine what percentage increase in the price of goods is "unfair" for the purposes of the statute?

Ord. Certifying Questions to the Wash. Sup. Ct. at 9.

As an initial matter, the parties disagree on the scope of the first certified question. Amazon contends that the question is whether "the CPA makes price increases of 15% or more during emergencies categorically unlawful" because the plaintiffs framed their complaint around that specific percentage threshold. Reply Br. of Appellant (Def.'s Reply Br.) at 4. The plaintiffs, on the other hand, contend that the question is more general—that is, whether price gouging is an unfair trade practice under the CPA—because their individual claims do not rest on a specific percentage threshold. Answering Br. of Appellees (Pls.' Br.) at 18-22. Instead, the plaintiffs claim that the 15 percent figure is immaterial at this juncture and relevant only for class certification purposes. *Id*.

The plaintiffs' first amended complaint alleges both that "charging consumers grossly inflated … prices during the COVID-19 pandemic" and that "a price increase of 15% on any consumer good or food item after a declared emergency" constitutes

3

an unfair act or trade practice under the CPA. CP at 64. The plaintiffs, it appears, advance both individual claims and class-based claims—the latter depending on whether a price increase crosses a certain percentage threshold as a basis for their claim. In certifying the questions to this court, the District Court did not appear to view the issue as solely hinging on whether a price increase above 15 percent during a state of emergency is categorically unfair; instead, as the plaintiffs contend, it seemed to view the issue more generally. *See* Ord. Certifying Questions to the Wash. Sup. Ct. at 1, 3-8 (discussing whether price gouging generally is an unfair trade practice under the CPA). The way the District Court framed the second question suggests that the percentage threshold question must also be answered.

Therefore, because the plaintiffs advanced both individual claims and class action claims in their complaint, we have reformulated the questions[1] as follows:

1. Does the CPA comprehend a claim of price gouging, as alleged by the individual plaintiffs in their first amended complaint, as an unfair practice?
2. Does the CPA's prohibition on unfair acts or practices prohibit price increases of 15 percent or more on any consumer good or food item after a declared emergency?
3. If yes to either question, then does the court or the jury determine when an alleged claim of "price gouging" constitutes an unfair trade practice under the CPA?

---

[1] "This court may reformulate a certified question." *Kellogg*, 199 Wn.2d at 214.

The first certified question, we answer in the affirmative and hold that price gouging, as alleged in the plaintiffs' first amended complaint, may be an unfair act or practice within the meaning of RCW 19.86.020. The second certified question, we answer in the negative. Finally, the answer to the third certified question depends on whether the defendant's conduct is disputed as explained below.

Context matters in answering these certified questions. This case is before us in the context of a Fed. R. Civ. P. 12(b)(6) motion to dismiss. In such a procedural posture, a plaintiff's allegations are presumed to be true and a court may even consider hypothetical facts. *Tenore v. AT&T Wireless Servs.*, 136 Wn.2d 322, 330, 962 P.2d 104 (1998); *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). To that end, our holdings today are narrow and simply hold the plaintiffs have stated a cognizable claim for relief under our CPA based on the facts alleged in their complaint.

*Greenberg et al., v. Amazon.com*, No. 101858-4

FACTS [2]

I.    BACKGROUND ON "PRICE GOUGING"

The Department of Justice defines "price gouging" as a term that lacks a formal definition; however, it typically refers to a "significant and rapid price increase after a demand." Joseph Nguyen Ho, *Price Gouging & Health Justice: Passing Anti-Price Gouging Laws amid a Pandemic*, 30 ANNALS HEALTH L. ADVANCE DIRECTIVE 213, 214 (2020) [http://perma.cc/CW47-M8NK]. "Often, price gouging is a situation where a retailer or a supplier takes advantage of increases in demand by 'charging exorbitant prices for necessities after a natural disaster or other state emergency.'" *Id*. (quoting Heather Morton, *Price Gouging State Statutes*, NAT'L CONF. OF STATE LEGISLATURES (Mar. 30, 2020), https://www.ncsl.org/research/financial-services-and-commerce/price-gouging-state-statutes.aspx).

Presently, there is no federal law prohibiting price gouging. Craig Carpenito et al., 30 PUB. LAW. 8, no. 2 (2022); also found at AM. BAR ASS'N, https://www.americanbar.org/groups/government_public/publications/public-

---

[2] The facts are largely derived from the first amended class action complaint because this case is before us on a Fed. R. Civ. P. 12(b)(6) motion to dismiss. In such a procedural posture, a plaintiff's allegations are presumed to be true and a court may even consider hypothetical facts. *Tenore*, 136 Wn.2d at 330; *Somers*, 729 F.3d at 959.

lawyer/2022-summer/the-federal-response-hoarding-and-price-gouging-during-

covid19-pandemic/ (last visited July 26, 2024).  Instead, price gouging is regulated

at the state level.  Julia Levitan, Note, *Price Gouging, the Amazon Marketplace, and

the Dormant Commerce Clause*, 55 COLUM. J.L. & SOC. PROBS. 373, 376 (2022).

Generally, states regulate price gouging through specific anti-price-gouging statutes,

broader consumer protection laws, and executive orders.  *Id*.  Currently, 37 states

and the District of Columbia have anti price-gouging statutes that prevent excessive

pricing.  *See* NAT'L CONF. OF STATE LEGISLATURES, https://www.ncsl.org/financial-

services/price-gouging-state-statutes  [http://perma.cc/4S62-RSGR].    These  price

gouging laws "respond to disaster, and consequently most statutes require some sort

of market disrupting event: anything from a terrorist attack to a hurricane,

earthquake, or other natural disaster."  Michael Brewer, Note, *Planning Disaster:

Price Gouging Statutes and the Shortages They Create*, 72 BROOK. L. REV. 1101,

1113 (2007).

All state anti-price-gouging laws "compare the price charged during the

emergency to the price charged before the emergency; however, there is no universal

standard by which states determine a product's pre-emergency price."  Levitan,

*supra*, at 377.  "Some states define the pre-emergency price as 'immediately' prior

to the emergency declaration, while other states use the price charged seven, ten, or

even thirty days prior to the declaration." *Id*. According to one commentator, "[t]hese temporal differences can be significant because the market often responds to a forecasted event before a state's price gouging laws are activated by the declaration of a state of emergency by the appropriate authority." *Id*. at 377-78.

Another significant difference between each state's anti-price-gouging statutes is the variation on what level of price increase constitutes unlawful price gouging. Ho, *supra*, at 215-16 [http://perma.cc/CW47-M8NK]. States have adopted a number of different approaches for determining whether a price increase is unlawful, which can be broken into three basic categories: (1) those that limit price increases to a fixed percentage over predisaster prices, (2) those that prohibit price increases that are deemed excessive, and (3) those that prohibit price increases absolutely. Brewer, *supra*, at 1113-14. Statutes that fall within the first category— the percentage increase caps—generally prohibit price increases from 10 percent to 25 percent of the predisaster price. *Id*. at 1114. Statutes that fall into the second category "provide little guidance as to what price level can be considered unconscionable, sometimes leaving it to the courts to determine as a matter of law." *Id*. But most statutes in this category permit defendants to argue that their price increases are directly attributable to increased costs. *Id*. at 1115. Finally, some state anti-price-gouging laws are "'outright bans'" that bar any increase in price following

8

an emergency declaration. Levitan, *supra*, at 377. "Moreover, considerable variation exists within each definitional category as to the goods and services covered by the law; some laws are narrowly tailored to specific products, while others apply indiscriminately to transactions of any good or service within the emergency area." *Id*.

Other differences among anti-price-gouging statutes include the amount of time that they are in effect. *Id*. at 378. Some anti-price-gouging statutes remain in effect for a limited time after an emergency declaration, which is subject to extensions by the state's governor or legislature, while others are coterminous with the length of the emergency. *Id*. Additionally, the geographical scope of a state's anti-price-gouging law depends on the nature of the declared emergency. *Id*. Often, a declaration of emergency is announced in response to particular conditions affecting certain parts of the state. *Id*. at 378-79. However, relevant here, "[t]he COVID-19 pandemic is unique because the virus triggered emergency declarations throughout the country—all fifty states and the District of Columbia issued declarations." *Id*. at 378.

Despite the variations across states, anti-price-gouging laws share the "common goal of consumer protection." *Id*. at 379. "[C]iting the extraordinary impacts of disasters on the workings of the market system, many state legislatures

reasoned that the public interest required laws to protect consumers from excessive prices." Brewer, *supra*, at 1112. However, Washington does not have an anti-price-gouging statute on the books. Ho, *supra*, at 215 n.14 [http://perma.cc/CW47-M8NK]. With this background in mind, we now address the facts of this case.

II. THE COVID-19 OUTBREAK, RESULTING EMERGENCY DECLARATIONS, AND INCREASING CONSUMER RELIANCE ON AMAZON.COM

In late 2019, COVID-19 was first identified in China and quickly spread across the world. CP at 25. On January 31, 2020, the United States Department of Health and Human Services (HHS) declared a nationwide public health emergency. CP at 26-27. Following the HHS's declaration, state governments began to issue their own declarations of emergency—the first being California, which occurred on March 19. CP at 27. Consistent with guidance from public health officials, state governments typically coupled their emergency declarations with "stay home," "shelter-in-place," or other types of lockdown orders requiring residents to remain in their homes to the extent feasible. CP at 27-28. "By April 20, 2020, 45 states had some form of 'stay home' order in place, covering approximately 95% of the U.S. population." CP at 28.

Although statewide "stay home" orders generally authorized residents to shop outside of the home for essential items if necessary, prominent health officials

encouraged consumers to shop online to protect themselves and stop the spread of COVID-19. CP at 29. Likewise, the United States Centers for Disease Control and Prevention advised all Americans to order food and other items online for home delivery or curbside pickup, if possible, and to visit the grocery store, or other stores selling household essentials, in person only when absolutely needed in order to limit exposure to the virus. *Id*. Individuals that contracted or were exposed to COVID-19 were instructed to stay home. CP at 30.

As COVID-19 continued to spread throughout the United States, reports of stockpiling, scarcity, and hoarding escalated. *Id*. In November 2020, during the second wave of COVID-19, consumers continued to "panic shop," which was evidenced by a sea of empty shelves in supermarkets across the nation. CP at 31.

In response to retail shortages and to limit exposure to COVID-19, more consumers turned to online shopping. CP at 32. The unprecedented demand on Internet retailers also led to product scarcity online with some retailers out of stock and experiencing shipping problems. CP at 33. The scarcity prompted consumers to become more reliant on Amazon—the world's largest online retailer—for essential consumer goods. *Id*. Indeed, industry observers recognized that Amazon saw an unprecedented demand amid the COVID-19 lockdowns. *Id*. In fact, "by July

11

2020, Amazon's sales accounted for almost half of all U.S. retail e-commerce." *Id*. (emphasis omitted).

### III.    THE PLAINTIFFS' PURCHASES ON AMAZON.COM IN 2020

The plaintiffs allege that Amazon engaged in price gouging between March and April 2020—when federal, state, and local declarations of emergency were in effect.   Below is a discussion of the products that each plaintiff purchased from Amazon during this time.

<u>Alvin Greenberg</u>.   Greenberg is 74 years old and resides in San Rafael, California.   CP at 7. Greenberg was at a heightened risk of experiencing complications from COVID-19 due to his age and asthma; thus, he heeded public health guidance and turned to online shopping.  CP at 7-9.  On April 21, 2020, while under a "shelter-in-place" order, he purchased three bottles of Clorox bleach from Amazon for $58.19 for his girlfriend, who lived in a different city and was unable to locate disinfectants in her area.  CP at 8-9.  Greenberg recognized the high price but believed he had no meaningful choice other than to purchase the product because of his health concerns and his inability to find the product elsewhere online.  *Id*.  The price that he paid represented a 168 percent increase from the price on January 31, 2020—the day the HHS issued the nationwide public health emergency.  CP at 9. He has not been reimbursed.  *Id*.

*Michael Steinberg*.   Steinberg lives in Oakland, California, and sought to prepare meals at home in order to comply with public guidance and to minimize exposure to COVID-19.  CP at 10-11.  In April 2020, he was unable to find bread yeast in local grocery stores or through other online retailers.  CP at 11.  However, on April 3, Steinberg found a two-pound pouch of Red Star Active Dry Yeast on Amazon for $39.97.  *Id*.  Steinberg felt that he had no meaningful choice but to purchase the yeast on Amazon because of his inability to find yeast elsewhere and to comply with the government's directive to shelter in place. CP at 11-12.  Steinberg recognized the price was high and complained to multiple Amazon employees, but he never received a refund.   CP at 12.  The price that he paid represented a 469 percent increase from the January 31, 2020 price—the day the HHS issued the nationwide public health emergency.  *Id*.

*Julie Hanson*.   Hanson is 57 years old and lives in Diamond Springs, California.   CP at 13-14.   She suffers from underlying conditions, such as Parkinson's disease and bronchiectasis, that heighten the risk that she will experience adverse, and potentially fatal, consequences should she contract COVID-19. CP at 14.  Like other local governments, her county government issued a shelter-in-place order and advised health-compromised individuals, like Hanson, to consider online options to deliver food and other supplies.  CP at 13-14.  In April 2020,

13

Hanson learned that her daughter was experiencing a flea outbreak in her home; thus, Hanson looked for flea medicine. CP at 14-15. Her daughter chose to stay home during the pandemic to protect herself and her diabetic son. CP at 15. Given her health conditions and government directives, Hanson did not feel safe shopping outside the home. CP at 14. She found Zodiac Flea & Tick Spray listed on Chewy.com, an online pet-supply retailer, but the product was not available for shipment. CP at 15. On April 30, 2020, she found the same product on Amazon and purchased it for $14.19. *Id*. The price that Hanson paid represented a 58 percent increase over the price on January 31, 2020—the day the HHS issued the nationwide public health emergency. *Id*. She has not been reimbursed. *Id*.

*Christina King*. King lives in Mesa, Arizona, and has a compromised immune system due to chemotherapy treatment that she completed in January 2020. CP at 16-17. Like many state governments, the Arizona governor issued a declaration of emergency and a statewide "stay home" order to curb the transmission of COVID-19. *Id*. As a result of her compromised immune system and the government directives, King turned to online shopping to obtain essential items. CP at 17. King typically compares prices across multiple platforms but discovered that essential goods were often unavailable or only available for short periods of time before

supplies were exhausted. *Id*. She alleges that Amazon price gouged her on five specific purchases, which are detailed below. CP at 18.

Around March 20, King sought to purchase beef ramen noodles for her mother, who had trouble finding the product in local stores. *Id*. King could not find the product her mother wanted online but found a 12-pack of Maruchan beef ramen noodles on Amazon for $38.89. *Id*. King recognized that the price was high, but because she could not find the product elsewhere, she saw no alternative but to make the purchase. *Id*. The price she paid represented an 826 percent increase from the January 31, 2020 price. *Id*. She has not been reimbursed for this purchase. *Id*.

Also, in March 2020, King sought to purchase a supply of rice, which is a staple grain for her family. CP at 18-19. She could not find rice at local grocery stores and checked online to no avail. *Id*. However, King found a four-pack of 32-ounce containers of RiceSelect Jasmati rice on Amazon for $44.95. CP at 19. She knew the price was high, but given her inability to find rice elsewhere and the importance of obtaining food staples for her family, King believed she had no meaningful choice but to purchase it on March 20. *Id*. The price she paid represented a 116 percent increase over the January 31, 2020 price. *Id*.

Around the same time, King sought to purchase hand sanitizer to stop the spread of COVID-19. *Id*. Due to the shortage of the product, King tried to make

15

her own, which required the use of vegetable glycerin. CP at 20. King did not recall seeing the product at retail stores in her area or online. *Id*. On March 13, she found a 16-ounce bottle of NOW Solutions vegetable glycerin for $11.54 on Amazon. *Id*. The product was supplied by Amazon itself. *Id*. Given her inability to find the product elsewhere and her supply of hand sanitizer dwindling, she saw no reasonable alternative but to purchase the product. *Id*. The price that King paid represented a 99 percent increase over the January 31, 2020 price. *Id*.

King also sought to protect herself and her family during the pandemic by using cleaning and disinfecting products on the surfaces of her home. CP at 20-21. This was consistent with guidance from public health authorities. *Id*. However, King observed shortages of disinfectants at physical and online stores. CP at 21. Throughout March 2020, she and her family tried to find disinfectant wipes to no avail. *Id*. King typically purchases cleaning products from eco-friendly manufacturers but could not find any from her preferred supplier. *Id*. Thus, she broadened her search for disinfectants of any kind and looked to both physical and online platforms, but she found none. *Id*. After several days of searching, she found a two-pack of Clorox Commercial Solutions Disinfecting Wipes on Amazon for $90 that was supplied by Amazon itself. *Id*. On March 20, given her inability to find disinfectants elsewhere, she saw no meaningful choice but to purchase the product.

16

*Id*.  The price that King paid represented a 65 percent price increase over the January 31, 2020 price.  *Id*.

In March 2020, King could not find distilled water anywhere.  CP at 22.  She sought to purchase distilled water for her husband's continuous positive airway pressure machine, which treats his sleep apnea.  *Id*.  On March 25, she was able to find a package of 24 bottles of Smartwater distilled water on Amazon for $56.76.  CP at 22-23.  She knew the price was high, however, given her inability to find distilled water elsewhere, she saw no alternative but to purchase the product.  CP at 22.  The price that King paid represented a 53 percent increase over the January 31, 2020 price.  CP at 22-23.

*Ronnell Robertson.*  Robertson lives in Hickory, North Carolina.  CP at 23.  On March 10, 2020, the governor of North Carolina declared a state of emergency, instructing employers and employees to telework to the greatest extent possible.  *Id*.  On March 17, Robertson sought out a supply of disinfectant wipes that he could use to sanitize surfaces in his home and office.  CP at 24.  Given the health risks posed by COVID-19, Robertson was particularly interested in obtaining medical-grade disinfectant, but retail outlets in his area were sold out of all types of disinfectant wipes.  *Id*.  Robertson searched online and found a supply of CaviWipes on Amazon for $26.99 per package.  *Id*.  This particular product was marketed as a powerful

disinfectant for use in medical settings. *Id*. Robertson did not believe that he had a meaningful choice but to purchase the product given the imminent health risks of COVID-19 and his inability to find disinfectants elsewhere. *Id*. He then bought eight packages of CaviWipes on Amazon. *Id*. The price that Robertson paid represented a 170 percent price increase over the January 31, 2020 price. *Id*.

IV.     THE PLAINTIFFS ALLEGE THAT AMAZON.COM CONTROLS THE PRICES OF ALL PRODUCTS SOLD ON ITS PLATFORM

Amazon is the world's largest online retailer and maintains its own inventory of products, which it sells directly to consumers across the country. CP at 36. Amazon-supplied products account for approximately 32 percent of the revenue from all products sold. *Id*. Amazon also sells products provided by third-party suppliers, which account for approximately 68 percent of its sales revenue. *Id*. Plaintiffs allege that as COVID-19 spread, Amazon's prices for many essential goods spiked dramatically. *Id*.

The plaintiffs allege that Amazon is responsible for unlawfully increasing the prices on its own products and products sold by third parties. CP at 51. They contend that Amazon is not a passive intermediary but rather controls the sale and marketing of all third-party products. *Id*. They also allege that Amazon receives a portion of the transaction proceeds—which is typically around 15 percent of the

sales price (in addition to assessing recurring fees on third-party suppliers). *Id.* In particular, third-party suppliers who enroll in Amazon's "Sold by Amazon" (SBA) program are guaranteed a "hands off the wheel selling experience" through which Amazon retains absolute discretion in setting the price. *Id.* In cases involving large or strategic third-party suppliers, plaintiffs allege that Amazon negotiates all pricing terms or negotiates terms ensuring that third-party suppliers do not undercut its prices when offering their products through other retail outlets. *Id.*

Plaintiffs also allege that Amazon offers third-party suppliers "Automated Pricing" services where Amazon will automatically adjust prices based on certain preset rules. CP at 52. This service generally adjusts the pricing of third-party products to match or stay in some relationship with competitor prices. *Id.* The service also coordinates pricing across Amazon's platform. *Id.* If competitive benchmarks increase for any reason—including price gouging—Amazon adjusts all automatically priced products accordingly. *Id.* Plaintiffs allege that if Amazon was concerned about inflated prices, it could have simply turned off its automatic repricing software for specific products. *Id.*

Plaintiffs further allege that even in instances where third-party suppliers retain some authority to set prices, Amazon still establishes the price ceiling and retains the ultimate right to reject a price through its "fair pricing policy." *Id.* This

policy provides that "'[a]ny single product or multiple products packages must have a price that is equal to or lower than the price of the same item being sold by the seller on other sites or virtual marketplaces.'" CP at 35 (alteration in original) (quoting University: Amazon Pricing Policy, FEEDVISOR, https://feedvisor.com/university/amazon-pricing-policy/ [http://perma.cc/7UGL-M746]. The policy also ensures that prices on Amazon are more favorable to other online alternatives, which plaintiffs contend drove consumers to Amazon during the pandemic. *Id*. Plaintiffs allege that if Amazon identifies a price for a product that it considers to be too high relative to other prices, then it may remove the offer, suspend the seller, or even remove the product from the "Buy Box"—the vehicle through which nearly all Amazon products are sold. CP at 52. Plaintiffs also allege that in other instances, Amazon can even unilaterally reduce the price of third-party products by providing the consumer with a discount, which appears as a credit in the consumer's account. *Id*.

V.     PLAINTIFFS ALLEGE AMAZON "PRICE-GOUGED" ITS WAY TO UNPRECEDENTED REVENUES DURING THE COVID-19 PANDEMIC

The plaintiffs collectively allege that "Amazon has exploited unprecedented consumer demand during the COVID-19 pandemic to reap extraordinary profits." CP at 59. They allege that Amazon's 2020 first-quarter net sales reached $75.5

billion, which is a 26 percent increase from the first quarter of 2019. *Id*. Additionally, they allege that Amazon continued to profit throughout the pandemic, pointing to Amazon's overall revenue in 2020 increasing by 38 percent—an increase of $100 billion—and its net profits spiking 84 percent. *Id*.

The plaintiffs contend that there are no countervailing benefits to Amazon's acts because the only party that benefited was Amazon, which reaped "blockbuster profits by charging excessive prices throughout the pandemic." CP at 65. They also contend that Amazon's profits were "earned only by exploiting consumers who have been forced to rely on Amazon to obtain essential goods during this unprecedented public health crisis." *Id*. They further contend that consumers do not benefit "when they are forced to overpay for goods they need to remain safe and healthy." *Id*. Additionally, the plaintiffs contend that "[o]n information and belief, Amazon's price increases were not directly attributable to additional costs imposed on Amazon by suppliers, and Amazon increased prices on many products in excessive and unfair amounts even when accounting for any additional costs and the markup Amazon customary applies to such products." *Id*.

ANALYSIS

I.   PRICE GOUGING CAN BE AN UNFAIR ACT OR TRADE PRACTICE UNDER THE CPA BASED ON THE PLAINTIFFS' INDIVIDUAL CLAIMS

"The purpose of the CPA is to '… protect the public and foster fair and honest competition,'" and it is to be 'liberally construed [so] that its beneficial purposes may be served.'" *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37, 204 P.3d 885 (2009) (quoting RCW 19.86.920).

A.   Legal Principles Governing the CPA

The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  RCW 19.86.020.  "To prevail on a CPA action, the plaintiff must prove '(1) [an] unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation.'"  *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 782, 295 P.3d 1179 (2013) (alteration in original) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986)).  Only the first element is at issue here.  On this point, our focus is on unfairness because the plaintiffs do not allege that Amazon's conduct was deceptive.[3]

---

[3] "[A]n act or practice can be unfair without being deceptive." *Klem*, 176 Wn.2d at 787.

The first CPA element may be predicated on a per se violation of a statute or an unfair act or practice not regulated by statute but in violation of public interest. *Klem*, 176 Wn.2d at 787. "A per se unfair trade practice exists when a statute which has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce has been violated." *Hangman Ridge*, 105 Wn.2d at 786. If a defendant's act or practice is not per se unfair, then the plaintiff must show the conduct is unfair "under a case-specific analysis of those terms." *Rush v. Blackburn*, 190 Wn. App. 945, 962, 361 P.3d 217 (2015); *see also Mellon v. Reg'l Tr. Servs. Corp.*, 182 Wn. App. 476, 489, 334 P.3d 1120 (2014); *Klem*, 176 Wn.2d at 785-87. As discussed above, price gouging is not regulated by statute in Washington and the plaintiffs do not allege a per se claim. Therefore, the issue here is whether Amazon's acts or practices are "unfair" under a case-specific analysis of that term.

The CPA does not define the term "unfair." *See* RCW 19.86.010, .020. However, this court has recognized that "[b]y broadly prohibiting 'unfair or deceptive acts or practices in the conduct of any trade or commerce,' the legislature intended to provide sufficient flexibility to reach unfair or deceptive conduct that inventively evades regulation." *Panag*, 166 Wn.2d at 49 (citation omitted) (quoting RCW 19.86.020). Thus, because the act does not define the term "unfair," this court has allowed the definitions to evolve through a "'gradual process of judicial

23

inclusion and exclusion.'" *Klem*, 176 Wn.2d at 785 (internal quotation marks omitted) (quoting *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 344, 779 P.2d 249 (1989)).

The "CPA is modeled after federal consumer protection laws and incorporates many provisions of the federal acts." *Id.* at 787; *see* 15 U.S.C. § 45(a). The legislature declared that the CPA was intended "to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices." RCW 19.86.920. In addition, the legislature also instructed that "the courts be guided by final decisions of the federal courts and final orders of the federal trade commission [(FTC)] interpreting the various federal statutes dealing with the same or similar matters." *Id*. "Although we have been guided by federal interpretations, Washington has developed its own jurisprudence regarding application of Washington's CPA." *Klem*, 176 Wn.2d 787. To this end, "[f]ederal court decisions are guiding, but not binding, authority." *Panag*, 166 Wn.2d at 47.

B.      Under Our CPA, the Substantial Injury Test in 15 U.S.C. § 45(n) is One of Many Ways an Act or Practice Unregulated by Statute Can Be "Unfair"

Like our CPA, the FTC Act of 1914 prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  Until the 1960s, "the FTC interpreted the unfair-practices prong primarily through agency adjudication."  *Fed. Trade Comm'n v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015).  In 1964, the FTC issued a "Statement of Basis and Purpose" for unfair or deceptive advertising and labeling of cigarettes, which explained that the following three factors governed unfairness determinations:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Id.* (quoting Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8,324, 8,355 (July 2, 1964)). "Almost a decade later, the Supreme Court implicitly approved these factors, apparently acknowledging their applicability to contexts other than cigarette advertising and labeling."  *Id.* (discussing *Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972)). The

25

FTC has referred to the above test as the three *S&H* criteria. *See Int'l Harvester Co.*, 104 F.T.C. 949, 1073 (1984).

Then in 1980, the FTC issued a second policy statement that clarified the three *S&H* criteria. *Wyndham Worldwide Corp.*, 799 F.3d at 243 (discussing FTC Unfairness Policy Statement, Letter from the FTC to Hon. Wendell H. Ford and Hon. John C. Danforth, Senate Comm. on Com., Sci., and Transp. (Dec. 17, 1980), *appended to Int'l Harvester Co.*, 104 F.T.C. 949, 1070 (1984) (hereinafter 1980 Policy Statement).[4] In the 1980 Policy Statement, the FTC stated that "[u]njustified consumer injury is the primary focus of the FTC Act, and the most important of the three *S&H* criteria. *By itself it can be sufficient to warrant a finding of unfairness*." *Id.* at 1073 (emphasis added). However, "[t]he independent nature of the consumer injury criterion does not mean that every consumer injury is legally 'unfair.'" *Id.* Instead, to justify a finding of unfairness, the injury must satisfy three tests: "[1] It must be substantial; [2] it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and [3] it must be an injury

---

[4] The 1980 Policy Statement is available for viewing at https://www.ftc.gov/legal-library/browse/ftc-policy-statement-unfairness. Though the original document is available at the aforementioned link, we use the citation to *Int'l Harvester* because that decision provides pincites, which in turn provide ease of reference for the reader.

that consumers themselves could not reasonably have avoided." *Id*. (hereinafter "substantial injury test").

As to the public policy criteria, the FTC noted that "[a]lthough public policy was listed by the *S&H* Court as a separate consideration, it is used most frequently by the [FTC] as a means of providing additional evidence on the degree of consumer injury caused by specific practices." *Id*. at 1075. However, it noted that in some instances, public policy considerations could "independently support" an FTC action. *Id*. In such cases, the FTC stated that

> the policy should be clear and well-established. In other words, the policy should be declared or embodied in formal sources such as statutes, judicial decisions, or the Constitution as interpreted by the courts, rather than being ascertained from the general sense of the national values. The policy should likewise be one that is widely shared, and not the isolated decision of a single state or a single court. If these two tests are not met the policy cannot be considered as an "established" public policy for purposes of the *S&H* criterion. The [FTC] would then act only on the basis of convincing independent evidence that the practice was distorting the operation of the market and thereby causing unjustified consumer injury.

*Id*. at 1076.

As to the unethical or unscrupulous conduct criteria, the FTC appeared to abandon this theory altogether as an independent basis for an unfairness claim. *Id*. The FTC explained:

27

> This test was presumably included in order to be sure of reaching all the purposes of the underlying statute, which forbids "unfair" acts or practices. It would therefore allow the [FTC] to reach conduct that violates generally recognized standards of business ethics. The test has proven, however, to be largely duplicative. Conduct that is truly unethical or unscrupulous will almost always injure consumers or violate public policy as well. The [FTC] has therefore never relied on [this] element of *S&H* as an independent basis for a finding of unfairness, and it will act in the future only on the basis of the [other] two.

*Id*.

In 1994, Congress amended 15 U.S.C § 45 by adding a new subsection that largely codified the 1980 Policy Statement.[5] *Wyndham Worldwide Corp*., 799 F.3d at 244; FTC Act Amendments of 1994, Pub. L. No. 103-312, § 9, 108 Stat. 1691, 1695. In its current form, the statute reads:

> The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless *the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition*. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.

---

[5] We say "largely codified" because 15 U.S.C § 45(n) did not adopt the FTC's position in the 1980 Policy Statement that public policy considerations could "independently support" an unfairness determination.

28

15 U.S.C. § 45(n) (emphasis added).

This court has not yet attempted to define the phrase "unfair acts or practices" for the purposes of our CPA. In *Klem*, this court stated that the substantial injury test in 15 U.S.C. § 45(n) *might* be the current standard to define unfair acts or practices. 176 Wn.2d at 787. However, the court declined to explore in detail how to define unfair acts for the purposes of our CPA, insisting that the question must wait for another day. *Id*. at 787-88. After *Klem*, divisions of our Court of Appeals appear to use the three *S&H* criteria in determining whether an act or a practice is "unfair" for the purposes of our CPA. *See, e.g.*, *Mellon*, 182 Wn. App. at 490; *Rush*, 190 Wn. App. at 962-63.

The plaintiffs contend that all three *S&H* criteria still apply in Washington and that their complaint satisfies each criterion. In order to promote the liberal construction of the CPA, we agree that the three *S&H* criteria apply in Washington. *See Young v. Toyota Motor Sales, U.S.A.*, 196 Wn.2d 310, 319, 472 P.3d 990 (2020) (recognizing that analogous federal consumer protection law may require showing materiality to prove the first element of a CPA claim, but Washington lawmakers did not adopt this requirement). Unlike the FTC Act, our CPA simply has no limitations on the range of effect the defendant's conduct must have for a plaintiff to state a cognizable claim to relief. Rather, in cases where a plaintiff alleges that

an act or practice is unfair, but that act or practice is not regulated by statute, the plaintiff needs to show only that the defendant's conduct is in violation of public interest. *Klem*, 176 Wn.2d at 787. Additionally, we go further to conclude the application of our CPA is not dependent on the federal *S&H* criteria and that there may even be additional ways that a plaintiff can show that act or practice that is unregulated by statute is unfair. *Id*. Accordingly, plaintiffs may satisfy the first element of a private CPA claim—an unfair or deceptive act—in a number of ways.

However, here, the plaintiffs adequately allege that their injuries satisfy the substantial injury test in 15 U.S.C. § 45(n). Therefore, we resolve this certified question on the basis of this test without discussion of the other *S&H* criteria or the plain language argument advanced by the Attorney General's Office. *See ADCI Corp. v. Bao Nguyen*, 16 Wn. App. 2d 77, 86, 479 P.3d 1175 (2021) (explaining that a statement is dicta when it is not necessary to the court's decision in a case).

The substantial injury test in 15 U.S.C. § 45(n) provides an act or practice is "unfair" when "[1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition." We hold that under this test, price gouging, as alleged in the plaintiffs' first amended complaint, may be an unfair act or practice within the meaning of our CPA.

C.     The Plaintiffs State a Plausible Claim for Relief under the Substantial Injury Test

We must take plaintiffs' allegations as true.[6]  Plaintiffs claim that they satisfy all three elements of the substantial injury test, and we agree.

i.     Each Plaintiff Suffered Monetary Harm

The first prong of the substantial injury test is whether "the act or practice causes or is likely to cause substantial injury to consumers." 15 U.S.C § 45(n); *see also Int'l Harvester Co.*, 104 F.T.C. at 1073, 1076.  In *Federal Trade Commission v. Neovi, Inc.*, the United States Court of Appeals for the Ninth Circuit explained that "[a]n act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people, or if it raises a significant risk of concrete harm.'"  604 F.3d 1150, 1157 (9th Cir. 2010) (quoting *Am. Fin. Servs. Ass'n v. Fed. Trade Comm'n*, 247 U.S. App. D.C. 167, 767 F.2d 957, 972 (1985), *cert. denied*, 475 U.S. 1011 (1986)).  The 1980 Policy Statement, which was largely codified by Congress in 15 U.S.C § 45(n), provided further insight on what constitutes substantial injury:

> The Commission is not concerned with trivial or merely speculative harms.  In most cases a substantial injury involves monetary harm, as when sellers coerce consumers into purchasing unwanted goods or services or when consumers buy defective goods or services on credit but are unable to assert against the creditor claims or defenses arising

---

[6] Under a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a plaintiff's allegations are presumed to be true. *Tenore*, 136 Wn.2d at 330; *Somers*, 729 F.3d at 959.

> from the transaction. Unwarranted health and safety risks may also support a finding of unfairness. Emotional impact and other more subjective types of harm, on the other hand, will not ordinarily make a practice unfair. Thus, for example, the Commission will not seek to ban an advertisement merely because it offends the tastes or social beliefs of some viewers, as has been suggested in some of the comments.

*Int'l Harvester Co.*, 104 F.T.C. at 1073 (footnotes omitted).

Here, the plaintiffs adequately allege a substantial injury. They each suffered monetary harm as a result of Amazon's alleged acts. They each paid higher prices on consumer goods and food items than they otherwise would have prior to the HHS's emergency declaration. CP at 7-25. Also, they have shown that Amazon's actions had widespread impacts and that Amazon is responsible for the price increases on its own products as well as products supplied by third parties. CP at 51-59, 64-65.

ii.    The Plaintiffs' Injuries Were Not Reasonably Avoidable

The second prong of the substantial injury test is whether the injury was "reasonably avoidable by consumers themselves." 15 U.S.C § 45(n); *Int'l Harvester Co*., 104 F.T.C. at 1074. "In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *Neovi, Inc.*, 604 F.3d at 1158. The Ninth Circuit has also opined that "[a]n injury is reasonably avoidable if consumers 'have reason to anticipate the impending

harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Davis v. HSBC Bank Nev., NA*, 691 F.3d 1152, 1168-69 (9th Cir. 2012) (quoting *Orkin Exterminating Co. v. Fed. Trade Comm'n*, 849 F.2d 1354, 1365-66 (11th Cir. 1988)). The 1980 Policy Statement provides:

> Normally we expect the marketplace to be self-correcting, and we rely on consumer choice—the ability of individual consumers to make their own private purchasing decisions without regulatory intervention—to govern the market. We anticipate that consumers will survey the available alternatives, choose those that are most desirable, and avoid those that are inadequate or unsatisfactory. However, it has long been recognized that certain types of sales techniques may prevent consumers from effectively making their own decisions, and that corrective action may then become necessary. Most of the Commission's unfairness matters are brought under these circumstances. *They are brought, not to second-guess the wisdom of particular consumer decisions, but rather to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking.*

*Int'l Harvester Co.*, 104 F.T.C. at 1074 (emphasis added).

Here, each plaintiff adequately alleged that their injuries were not reasonably avoidable. Each plaintiff made efforts to find their respective goods and food items (which they needed to stay safe and healthy) from physical and online stores. CP at 7-25. Yet, they were unable to find their essential goods except for on Amazon. *Id*. Additionally, each plaintiff alleged that given product scarcity and their respective

local government's directives to shelter in place during the pandemic, they had no meaningful choice but to purchase their products from Amazon and that they have not been reimbursed. *Id*.

     iii. Amazon's Acts or Omissions Offer No Countervailing Benefits

The third prong of the substantial injury test looks to whether the alleged injury is "outweighed by countervailing benefits to consumers or to competition." 15 U.S.C § 45(n); *Int'l Harvester Co.*, 104 F.T.C. at 1073-74. In addressing this factor in the 1980 Policy Statement, the FTC recognized that "[m]ost business practices entail a mixture of economic and other costs and benefits for purchasers," and, therefore, "will not find that a practice unfairly injures consumers unless it is injurious in its net effects." *Int'l Harvester Co.*, 104 F.T.C. at 1073. In *American Financial Services*, the Court of Appeals for the District of Columbia Circuit explained that "[t]o make this cost-benefit determination, the [FTC] examines the potential costs that the proposed remedy would impose on the parties and society in general." 767 F.2d at 975.

Here, the plaintiffs adequately allege the third prong of the substantial injury test. They allege that there are no countervailing consumer or competitive benefits to Amazon's practice of "price gouging" during the pandemic. CP at 65. They contend that the only party that benefited from their respective transactions was

Amazon, which "reaped blockbuster profits by charging excessive prices throughout the pandemic" and these profits were "earned only by exploiting consumers who have been forced to rely on Amazon to obtain essential goods during this unprecedented public health crisis." *Id*. In fact, the plaintiffs allege that by July 2020, Amazon's sales accounted for almost half of all U.S. retail e-commerce, which suggests there is no benefit to competition. CP at 33. Additionally, they allege that "[c]onsumers do not 'benefit' when they are forced to overpay for goods they need to remain safe and healthy," especially where such price increases were not directly attributable to additional costs imposed on Amazon by suppliers or by the markup that Amazon customarily applies to such products. CP at 65.

Accordingly, taking the plaintiffs' allegations as true, they have demonstrated that "price gouging," as alleged in their first amended complaint, may amount to an unfair practice under the CPA.

> D. Amazon Unpersuasively Relies on Inapposite Precedent To Suggest That the Substantial Injury Test Does Not Apply

Amazon contends that nothing in the CPA's text can be read to prohibit price gouging given its general and abstract nature. Opening Br. of Appellant (Def.'s Br.) at 21-27. In so arguing, Amazon relies on various cases restating the established principles of statutory interpretation. *Id*. However, Amazon's argument is

unpersuasive because it ignores the unfairness tests discussed above. Amazon's argument to limit the reach of the CPA's protections is also unconvincing because it conflicts with the stated intent of the act, which is to "protect the public and foster fair and honest competition." RCW 19.86.920.

Amazon also contends that the court cannot invent new standards out of whole cloth to support plaintiffs' price gouging claims, and that this court's precedent establishes that "the CPA creates a cause of action only for conduct deemed unfair under established standards, including federal FTC Act guidance and existing Washington law making claims actionable under the CPA." Def.'s Br. at 31-34 (citing *Panag*, 166 Wn.2d 27; *Klem*, 176 Wn.2d 771; *State v. Reader's Dig. Ass'n*, 81 Wn.2d 259, 501 P.2d 290 (1972)).

Amazon's reliance on *Panag*, *Klem*, and *Reader's Digest* fails and its concerns are misplaced because the court is not inventing a new standard but, rather, applying decades old precedent established by the FTC itself. Indeed, the FTC's 1980 Policy Statement and 15 U.S.C § 45(n) make clear that showing a violation of established public policies is not required to state a claim for unfairness. Rather, the substantial injury test itself can be sufficient.

Next, Amazon argues that the court does not need to use a multifactor test, such as the substantial injury test, to determine that a business practice is beyond the

scope of the CPA. Def.'s Reply Br. at 19-21. To support its proposition, Amazon relies on cases that are inapposite. *See Short v. Demopolis*, 103 Wn.2d 52, 691 P.2d 163 (1984); *Quimby v. Fine*, 45 Wn. App. 175, 724 P.2d 403 (1986); *Stevens v. Hyde Athletic Indus., Inc.*, 54 Wn. App. 366, 773 P.2d 871 (1989).

In *Short*, the question before this court was whether the practice of law fell within the phrase "trade or commerce" under the CPA. 103 Wn.2d at 55. This court held that certain entrepreneurial aspects of the practice of law may fall within the definition of "trade or commerce," but claims of legal negligence or malpractice fell outside of that definition and, therefore, outside the purview of the CPA. *Id*. at 60-62.

Likewise, in *Quimby*, the question before the Court of Appeals was whether the practice of medicine was considered within the sphere of "trade or commerce" for the purposes of the CPA. 45 Wn. App. at 179-80. Relying on *Short*, the Court of Appeals held that the Quimbys' medical negligence claim, which paralleled legal negligence, was exempt from the CPA because it related to the actual competence of the medical practitioner. *Id*. at 180. However, the court held that the Quimbys' lack of informed consent claim against a health care provider may be within the scope of the CPA "if it relate[d] to the entrepreneurial aspects of the medical practice." *Id*. at 181.

Finally, in *Stevens*, the question before the Court of Appeals was whether the plaintiff's personal injury claims fell within the meaning of "business or property" under RCW 19.86.090. 54 Wn. App. at 368-69. Relying on federal precedent, the Court of Appeals held that personal injury claims do not fall within the coverage of the CPA because they do not meet the definition of "business or property." *Id*. at 369-70.

In summary, *Short*, *Quimby*, and *Stevens* did not apply the *S&H* criteria or the modern substantial injury test because they dealt with whether certain claims met the definition of "trade or commerce" or "business or property." However, the issue here is whether the plaintiffs' price gouging claims amount to an "unfair" act or practice within the meaning of the CPA. The cases Amazon relies on answer a different question than what is presented to this court. Accordingly, Amazon's reliance on these cases fail.

Additionally, Amazon argues that the *S&H* criteria should not apply because "[c]ourts have recognized new theories of liability under the CPA only when those theories follow from existing precedent or statutes." Def.'s Reply Br. at 20. To support this proposition, Amazon relies on *Panag*, 166 Wn.2d 27, and *Rush*, 190 Wn. App. 945.

Amazon's reliance on *Panag* is inapposite because that case dealt with whether the CPA applied to a collection agency's allegedly deceptive efforts to collect on an insurance company's subrogation claim against an underinsured motorist. 166 Wn.2d at 34, 47. We are not asked to determine whether price gouging is a deceptive practice but, rather, whether the practice of price gouging can be unfair.[7]

Similarly, Amazon's reliance on *Rush* is misplaced. In *Rush*, the Court of Appeals looked to statutes and regulations because it applied the first prong of the *S&H* criteria in determining whether the defendant's act of selling the plaintiff's vehicle at an auction amounted to an unfair or deceptive act. 190 Wn. App. at 961-67. It also applied the substantial injury test thereafter to supplement its public policy analysis. *Id*. at 966-67. As explained above, the court needs only to look to well-established policy sources—such as statutes, judicial decisions, or regulations—when a plaintiff relies on the public policy prong of the *S&H* criteria. It also serves as additional evidence as to determining an unfair act or practice. However, reliance on these sources in determining whether an act or practice is

---

[7] In fact, the court in *Panag* seemed to recognize the applicability of the substantial injury test to unfairness determinations in passing. 166 Wn.2d at 50-51 (discussing *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 48 Cal. Rptr. 3d 770 (2006)).

unfair is not required, and the substantial injury test alone may be sufficient. Accordingly, Amazon is incorrect to suggest that a plaintiff must show violations of well-established statutes and regulations on the subject to conclude that a practice is unfair.

E.    Amazon's Reliance on Federal Precedent Is Unpersuasive

Amazon argues that federal courts have affirmatively stated that there is no claim for price gouging under federal law, which in turn suggests that there could not be such a claim under our CPA.  Def.'s Br. at 30; Def.'s Reply Br. at 9.  To support its proposition, Amazon relies on *Whitaker Cable Corp. v. Fed. Trade Comm'n*, 239 F.2d 253 (7th Cir. 1956), and *Gutierrez v. Bean*, 2006 WL 4117064 (D.N.M. Dec. 13, 2006) (court order).  We disagree.

First, Amazon contends that price gouging is not comprehended under federal law because doing so would "turn the [FTC] Act into a price control law contrary to its manifest purpose." *Whitaker Cable Corp*., 239 F.2d at 256.  Amazon's reliance on *Whitaker Cable Corp* and *Gutierrez* is unpersuasive.  *Whitaker Cable Corp.* is distinguishable because it involves a different section of the FTC Act and makes no mention of unfairness, and reliance on *Gutierrez,* a nonbinding precedent, is dubious at best.

Second, Amazon contends that the CPA could not comprehend the plaintiffs' price gouging claims because courts across the country have consistently rejected similar efforts to expand a general consumer protection law to include such a claim. Def.'s Br. at 38-39.  We reject this argument.

Again, Amazon's cited cases are distinguishable or unpersuasive.  *Scavio v. Smart Corp.* is distinguishable because, unlike here, the plaintiffs in that case failed to show that they were deceived under the Ohio Consumer Protection Act and because they failed to show that their alleged injuries (paying excessive prices for copies of medical records) were not reasonably avoidable.  2001 WL 631326 at *3, *5 (N.D. Ohio Apr. 26, 2001) (court order).  There is simply no claim of deception here and the plaintiffs have adequately shown that their injuries were not reasonably avoidable, as explained above.

Likewise, *Sullivan v. Laboratory Corp. of America Holdings* is distinguishable because, unlike here, the plaintiffs there failed to show an exigency that coincided with the defendant's alleged act of charging excessive prices for medical testing, which was required under the North Carolina Unfair and Deceptive Trade Practices Act.  2018 WL 1586471, at *4-5 (M.D.N.C. Mar. 28, 2018) (court order).

Amazon cites to *Southeastern Pennsylvania Transportation Authority v. Gilead Sciences, Inc*. to support its proposition that "exorbitant" pricing alone is insufficient to render a contract "unfair" under California Business & Professions Code § 17200. 102 F. Supp. 3d 688 (E.D. Penn. 2015). The plaintiffs here do not allege "exorbitant" pricing alone—their claims are premised on Amazon allegedly taking advantage of surging demand on online retailers during the pandemic. Unlike Washington's CPA, the analogous California law in *Gilead Sciences, Inc*. requires a plaintiff to show a violation of another law to state a cause of action under § 17200's prohibition against unlawful business acts or practices. *Id*. at 707. There, the plaintiffs also failed to state a claim under any of the three *S&H* criteria. *See id*. at 707 n.8. The plaintiffs here adequately satisfy the substantial injury test.

Similarly, Amazon's reliance on *Siegel v. Shell Oil Co*. is misplaced because the plaintiff there failed to show that Shell's practice of charging allegedly artificially inflated prices for gas caused him harm, that he suffered substantial injury, and that he could not avoid the injury. 612 F.3d 932, 937 (7th Cir. 2010). Causation is not at issue here and the plaintiffs have demonstrated a claim to relief under the substantial injury test.

Therefore, Amazon's reliance on the aforementioned cases is troubling and fails because none of those cases suggest that price gouging could not be contemplated under a general consumer protection act like our CPA.

F.    Amazon's Reliance on the Legislature's Failure To Pass Engrossed Substitute Senate Bill (ESSB) 5191[8] Is Unpersuasive

Amazon argues that like in *State v. Schwab*, 103 Wn.2d 542, 693 P.2d 108 (1985), the legislature's decision to reject ESSB 5191 demonstrates that the CPA could not comprehend the plaintiffs' price gouging claims. Def.'s Br. at 35-37; Def.'s Reply Br. at 13-18.  We disagree.

In *Schwab*, this court declined to allow CPA actions based on violations of the Residential Landlord-Tenant Act of 1973 (RLTA), ch. 59.18 RCW.  103 Wn.2d at 553.  This court considered it inappropriate to extend the CPA to landlord-tenant disputes based on the detailed nature of the RLTA, which includes a vast array of specific remedies. *Id*. at 550-51.  Additionally, the court refused to extend the CPA to landlord-tenant disputes because the legislature expressly rejected a proposed amendment to define RLTA violations as per se violations of the CPA. *Id.* at 552 (the "Senate was well aware of the effect of what it was doing when it turned down the amendment extending the [CPA] to violations of the [RLTA]").

---

[8] ESSB 5191, 67th Leg., Reg. Sess. (Wash. 2021).

Amazon's reliance on *Schwab*, however, is unconvincing because its reasoning loses force under the circumstances present here. Unlike *Schwab*, here there is no analogous, comprehensive statute that provides all the rights and remedies to the plaintiffs.[9] *Schwab* declined to extend the violations of the RLTA because that act already delineated the specific rights, duties, and remedies of both landlords and tenants. *Id*. at 551. That is simply not the case here because the legislature failed to pass ESSB 5191. It is well established that "legislation that has not been enacted … reveals little about the intent of the legislature and should not generally be relied on." *Lowe's Home Ctrs., LLC v. Dep't of Revenue*, 195 Wn.2d 27, 41 n.5, 455 P.3d 659 (2020). Accordingly, this argument fails.

G.     We Decline To Address Amazon's Constitutional Arguments

"[W]hen a federal court certifies a question to this court, this court answers only the discrete question that is certified and lacks jurisdiction to go beyond the question presented." *Kitsap County v. Allstate Ins. Co*., 136 Wn.2d 567, 577, 964 P.2d 1173 (1998). Where an issue is not within the certified questions and is within the province of the federal court, this court will not reach the issue. *See Wilmot v. Kaiser Alum. & Chem. Corp*., 118 Wn.2d 46, 78-79, 821 P.2d 18 (1991). The federal

---

[9] Again, plaintiffs are not advancing a per se claim or relying exclusively on an established source of public policy as the basis of their CPA claims.

court retains jurisdiction over all matters except the local question certified. *Lige Dickson Co. v. Union Oil Co.*, 96 Wn.2d 291, 294-95, 635 P.2d 103 (1981).

Amazon contends that recognizing the plaintiffs' price gouging claims under the CPA would raise serious constitutional concerns, such as significant notice, vagueness questions, and issues surrounding the dormant commerce clause. Def.'s Br. at 49-55. Amazon further contends that the separation of powers doctrine would be violated by recognizing the plaintiffs' price gouging claims under our CPA because such a decision is best fit for the legislature. *Id*. at 39-48. The District Court did not certify to this court the constitutional issues Amazon now advances; therefore, we decline to address them.

Accordingly, we answer the first certified question in the affirmative and hold that price gouging, as alleged in the plaintiffs' first amended complaint, may be an unfair act or practice within the meaning of RCW 19.86.020.

II. WE DECLINE TO RECOGNIZE A RIGID 15 PERCENT PRICE INCREASE THRESHOLD AS A PREDICATE TO A PRICE GOUGING CLAIM

This court has long ago stated that "[i]t is primarily a legislative, and not a judicial, function to determine economic policy." *State v. Sears*, 4 Wn.2d 200, 207, 103 P.2d 337 (1940). This court has also stated that "we must avoid stepping into the role of the Legislature by actively creating the public policy of Washington."

*Sedlacek v. Hillis*, 145 Wn.2d 379, 390, 36 P.3d 1014 (2001).  These points were essentially observed in *Schwab* where this court stated, "There is a marked difference between the judicial and legislative processes of inclusion and exclusion of activities under the [CPA]."  103 Wn.2d at 547.  The court explained:

> In the legislative process, the people engaged in the activity sought to be specifically included within the act have the full opportunity to be heard and to have their particular problems considered at legislative hearings.  Furthermore, the merits of any such proposed inclusion are subject to debate and amendment in legislative committees and on the floor of the respective houses of the Legislature.
>
> The judicial process, on the other hand, does not always provide equivalent opportunities.  In the present case, for example, the State Attorney General's Office represents the interests of the public (and indirectly the rights of the individual tenants), whereas the landlord appearing pro se represents himself in a case which potentially affects every person in the state who rents out or ever will rent out one or more dwelling units.  Although the Legislature has mandated that the "act shall be liberally construed that its beneficial purposes may be served", RCW 19.86.920, that is not to say that the judiciary should not give the most careful consideration to the "process of judicial inclusion and exclusion" of activities under the act.

*Id*. at 547-48 (footnotes omitted).

The plaintiffs ask this court to hold that any price increase of 15 percent or more on any consumer good or food item during a declared emergency is "unfair" for the purposes of our CPA.  It is beyond this court's wheelhouse to declare that a certain percentage price increase is unlawful because doing so threatens the

prerogative of the legislative branch. A decision to set such a price increase threshold entails numerous social and economic considerations, and is best left to the legislature. Therefore, we answer the second certified question in the negative.

III. WHETHER THE PLAINTIFFS SATISFY THE SUBSTANTIAL INJURY TEST IS A MIXED QUESTION OF LAW AND FACT FOR THE JURY TO RESOLVE, UNLESS THE FACTS ARE UNDISPUTED

A jury decides whether a particular act is unfair in situations where a plaintiff advances a claim that is not regulated by statute or some other well-established source of public policy, and where the underlying facts regarding the defendant's conduct is disputed. However, where the underlying facts are undisputed, the court decides the matter as a question of law. Accordingly, the answer to the third certified question depends on the circumstances of each case.

Amazon contends that determining whether a particular act is "unfair" is a question of law for the court to decide. Def.'s Br. at 56-67. To support its proposition, Amazon cites *Leingang v. Pierce County Medical Bureau, Inc.*, 131 Wn.2d 133, 930 P.2d 288 (1997), *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 948 P.2d 816 (1997), *Panag*, 166 Wn.2d 27, and *Trujillo v. Northwest Trustee Services, Inc.*, 183 Wn.2d 820, 355 P.3d 1100 (2015). On the other hand, the plaintiffs contend that whether an act or practice is "unfair" is generally an issue for the jury because it involves resolving a mixed question of law and fact—a function typically

served by juries.  Pls.' Br. at 56-62.   For support of their proposition, the plaintiffs

cite to *Delgado Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 32 P.3d 250

(2001).

> A.   *Leingang* and Its Progeny Demonstrate That a Court Will Decide
>      Whether Conduct Is Unfair When the Plaintiff Predicates Their CPA
>      Claim on a Violation of Another Statute and When There Is Dispute
>      about the Applicability of That Statute, or When the Underlying Facts
>      Are Undisputed

This certified question addresses a tension among our precedents—namely,

between *Leingang*, its progeny, and *Guijosa*.  Ord. Certifying Questions to the Wash.

Sup. Ct. at 6-7.  In *Leingang*, this court stated that "whether the conduct constitutes

an unfair or deceptive act can be decided by this court as a question of law."  131

Wn.2d at 150.  Following that decision, this court has repeatedly reaffirmed that

standard.  *See Sing*, 134 Wn.2d at 29-30; *Panag*, 166 Wn.2d at 47; *Trujillo*, 183

Wn.2d at 835.  However, in *Guijosa*, this court in passing stated that "the jury [is]

free to determine what could constitute an unfair and deceptive act or practice."  144

Wn.2d at 921.  This passing statement in *Guijosa* appears to suggest that the issue

of whether an act or practice is unfair could also be decided as a question of fact for

the jury to resolve.

Although *Leingang* and its progeny and *Guijosa* appear to be in tension at face value, when viewing their statements in the context of their respective decisions, it is clear that the two lines of cases can be harmonized and no tension exists.

*Leingang* involved a situation where the plaintiff sued a health care service contractor, contending that by violating applicable insurance regulations (among other things), it also violated the CPA's prohibition against unfair or deceptive acts or practices. 131 Wn.2d 149-56. The trial court ultimately granted summary judgment in favor of the plaintiff on the CPA cause of action, and the health care service contractor appealed. *Id.* at 142. Noting that the plaintiff's CPA claim was predicated on a violation of another law and that the case was before the court on a summary judgment order, this court decided to review whether the health care service contractor committed an unfair or deceptive act as a question of law. *Id.* at 149-50. This court's entire discussion on the topic is reproduced below:

> The issue here is whether PCM committed an "unfair or deceptive act." Whether a party in fact committed a particular act is reviewable under the substantial evidence test. However, the determination of whether a particular statute applies to a factual situation is a conclusion of law. Consequently, whether a particular action gives rise to a Consumer Protection Act violation is reviewable as a question of law. *Keyes v. Bollinger*, 31 Wn. App. 286, 289, 640 P.2d 1077 (1982); *Roger Crane & Assocs., Inc. v. Felice*, 74 Wn. App. 769, 780, 875 P.2d 705 (1994); *Estate of Hall v. HAPO Credit Union*, 73 Wn. App. 359, 365, 869 P.2d 116, *review denied*, 124 Wn.2d 1026 (1994); *Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 64 Wn.

> App. 553, 560, 825 P.2d 714, *review denied*, 120 Wn.2d 1002 (1992);
> *Gingrich v. Unigard Sec. Ins. Co.*, 57 Wn. App. 424, 433, 788 P.2d
> 1096 (1990). Therefore, since there is no dispute of facts as to what the
> parties did in this case, whether the conduct constitutes an unfair or
> deceptive act can be decided by this court as a question of law.

*Id*. Thus, as is evident from this discussion, the court decided the issue because it

was determining whether a particular statute or regulation applied to the factual

circumstances present and because the underlying facts were not disputed, which

certainly is a question of law. *See, e.g.*, *Wash. Imaging Servs., LLC v. Dep't of

Revenue*, 171 Wn.2d 548, 555, 252 P.3d 885 (2011). In fact, the court cited to cases

to support this well-established proposition.

In the years since, this court has repeatedly stated that the issue of whether a

particular act is unfair is a question of law for the court to resolve. *See Panag*, 166

Wn.2d at 47 ("The next issue is whether … the first *Hangman Ridge* element has

been established. Whether a particular act or practice is 'unfair or deceptive' is a

question of law." (quoting *Leingang*, 131 Wn.2d at 150)); *Trujillo*, 183 Wn.2d at

835 ("Whether an act is unfair or deceptive is a question of law." (citing *Leingang*,

131 Wn.2d at 150)). Significantly, both *Panag* and *Trujillo* cite to *Leingang* for this

proposition. Though not precisely stated, both *Panag* and *Trujillo* reviewed the issue

as a question of law because, like in *Leingang*, they dealt with whether a violation

of a particular statute, or some other well-established source of public policy, gave

rise to a CPA cause of action. In *Panag*, the issue was whether the defendant's insurance subrogation collection notices amounted to a deceptive practice that implicated the public policies espoused by the insurance code and debt collection statutes. 166 Wn.2d at 55. Similarly, in *Trujillo*, the issue was whether an alleged violation of the deeds of trust act was sufficient to support the plaintiffs' CPA claim. 183 Wn.2d at 827, 834-35.

Additionally, like *Leingang*, the procedural posture of both *Panag* and *Trujillo* properly made the issue reviewable as a question of law. In *Panag*, the case was before this court on orders of summary judgment. 166 Wn.2d at 36. This is significant because, at this procedural stage, the trial court will grant such an order only when "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). In fact, in situations where there are no disputed issues of material fact and the issue is how a statute or regulation applies to the facts of the case, this court has stated that the issue is a question of law for the court to resolve. *Wash. Imaging Servs., LLC*, 171 Wn.2d at 555. Similarly, in *Trujillo*, the case was before this court on an order granting the defendant's CR 12(b)(6) motion to dismiss. 183 Wn.2d at 829. This is also significant because, at this stage, the court must presume that the plaintiff's factual allegations are true and draw all reasonable inferences

from the factual allegations in the plaintiff's favor. *Gorman v. City of Woodinville*, 175 Wn.2d 68, 71, 283 P.3d 1082 (2012). In other words, the facts at the dismissal stage are not in dispute, which in turn permits an issue to be decided as a question of law. *See Cutler v. Phillips Petrol. Co*., 124 Wn.2d 749, 755, 881 P.2d 216 (1994).

Similarly, in *Sing*, the court stated, "[T]he question of whether a particular conduct gives rise to a CPA violation is reviewable as a question of law." 134 Wn.2d at 30. But unlike *Leingang*, *Panag*, and *Trujillo*, *Sing* was based on an alleged breach of fiduciary duties, which is common law based and, at the time of the lawsuit, these duties were not codified. *See Sing*, 134 Wn.2d at 31 n.3. However, this distinction is not fatal to the plaintiffs' contention. Though imprecisely stated, the court in *Sing* appeared to review the issue as a question of law because the case was before the court on a denial of the defendant's motion for a judgment as a matter of law. *Id*. at 29-30. This procedural posture is significant because such motions occur after a jury verdict and are appropriately granted "when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party." *Id*. at 29. In other words, the underlying facts in such motions are not in dispute. Accordingly, consistent with *Leingang*, *Panag*, and *Trujillo*, the

*Sing* court suggests that where the facts are undisputed, the court will review whether the conduct is unfair or deceptive as a matter of law.

Thus, reading this court's previous decisions in context, it is clear that the court will decide whether an act or practice is unfair under the CPA when a plaintiff seeks to predicate their claim on a violation of another statute or some well-established source of public policy—especially where there is dispute about the applicability of the statute or policy to the CPA. Additionally, where the underlying conduct is undisputed, then the court will likewise decide the issue as a matter of law. However, in the circumstance presented in this case, where the underlying conduct is disputed, then the issue is to be resolved by a jury.

B.      *Guijosa*'s Passing Statement Does Not Conflict with *Leingang* and its Progeny

In *Guijosa*, three plaintiffs sued Wal-Mart and two of its employees for assault and battery, false imprisonment, malicious prosecution, deprivation of civil rights, and violations of the CPA. 144 Wn.2d at 912. The claims were based on an incident where two Wal-Mart employees detained the plaintiffs for allegedly stealing a hat from the store. *Id*. at 911-12. The jury found for Wal-Mart on all claims except for the CPA claim. *Id*. at 912-13. Wal-Mart subsequently filed a motion for judgment as a matter of law under CR 50(b), asserting that without a finding of discrimination,

there was insufficient evidence to find violations of the CPA. *Id*. at 913. This court agreed and held that the plaintiffs failed to establish the first *Hangman Ridge* element of their CPA claim, and the court reasoned that the plaintiffs did not allege or prove any act or practice, other than discrimination, that violated the CPA. *Id*. at 921.

In so holding, this court stated in passing that "the jury was free to determine what could constitute an unfair and deceptive act or practice" for the purposes of the CPA. *Id*. The court made the statement without any citation to pertinent authority. However, as the plaintiffs correctly suggest, a return to first principles helps explain *Guijosa*'s passing statement. Pls.' Br. at 57-62.

Mixed questions of law and fact involve the application of legal precepts to a particular set of factual circumstances. *Erwin v. Cotter Health Ctrs., Inc*., 161 Wn.2d 676, 687, 167 P.3d 1112 (2007). "Analytically, resolving a mixed question of law and fact requires establishing the relevant facts, determining the applicable law, and then applying that law to the facts." *Tapper v. State Emp't Sec. Dep't*, 122 Wn.2d 397, 403, 858 P.2d 494 (1993). It is well established that "[m]ixed questions of fact and law may be submitted to a jury under proper instructions, 'unless the facts are undisputed and the inferences to be drawn from them are plain and not open to doubt by reasonable persons.'" *Anfinson v. FedEx Ground Package Sys., Inc*., 159 Wn. App. 35, 72, 244 P.3d 32 (2010) (quoting *Zurfluh v. Lewis County*, 199 Wash.

378, 381, 91 P.2d 1002 (1939), *overruled in part on other grounds by Portland-Seattle Auto Freight, Inc. v. Jones*, 15 Wn.2d 603, 131 P.2d 736 (1942) (holding question of proximate cause is a mixed question of law and fact that must be submitted to the jury unless the facts are undisputed)); *see also Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 423-24, 135 S. Ct. 907, 190 L. Ed. 2d 800 (2015) (stating that mixed questions of law and fact are typically resolved by juries.).

*Guijosa* presented such a circumstance, which explains why the plaintiffs' claims were sent to the jury. The plaintiffs claimed that Wal-Mart engaged in discrimination, which served as a predicate to their CPA claims. The applicable legal standard was supplied by the Washington Law Against Discrimination (WLAD), ch. 49.60 RCW; however, the underlying facts of Wal-Mart's conduct was disputed. Thus, because the facts were disputed, the plaintiffs' claims were placed before the jury to resolve.

However, *Guijosa* presented a different situation than what is at issue here. The *Guijosa* plaintiffs predicated their claim based on a violation of another statute (WLAD), and, here, the plaintiffs are advancing a case-specific claim of unfairness. This distinction is not fatal to the plaintiffs' claims. Like all mixed questions of law and fact, the plaintiffs' claims involve the application of legal precepts (the definition of "unfair" as established by the substantial injury test) to a particular set

55

of factual circumstances (the details of Amazon's conduct). *See Erwin*, 161 Wn.2d at 687.

Finally, Amazon contends that any proposal for case-by-case "unfairness" determinations by juries would present serious fair notice and due process problems for businesses. Def.'s Br. at 63-67. However, the District Court did not certify any constitutional questions to this court in its order. We therefore lack jurisdiction to go beyond the questions presented and decline to address Amazon's constitutional concerns. *Allstate Ins. Co.*, 136 Wn.2d at 577.

Accordingly, in the context of case-specific claims of unfairness, the court decides whether an act or practice is unfair if the underlying facts are not in dispute, and where the underlying facts are disputed, a jury decides the matter.

CONCLUSION

We answer the first certified question of whether the CPA comprehends a claim of price gouging, as alleged by the individual plaintiffs in their first amended complaint, as an unfair practice in the affirmative. Price gouging, as alleged by the plaintiffs' first amended complaint, may be an unfair act or practice within the meaning of RCW 19.86.020. We answer the second certified question, whether the CPA's prohibition on unfair acts or practices prohibit price increases of 15 percent or more on any consumer good or food item after a declared emergency, in the

56

negative. Finally, since we answered the first certified question in the affirmative, our answer to the third certified question is that when an alleged claim of "price gouging" constitutes an unfair trade practice under the CPA, a jury decides whether a particular act is unfair in situations when a plaintiff advances a case-specific unfairness claim that is not regulated by statute or by some other well-established public policy. However, where the underlying facts regarding the defendant's conduct is disputed, the court decides unfairness as a matter of law.

_____
Whitener, J.

WE CONCUR.

_____
González, C.J.

_____

_____
Yu, J.

_____
Montoya-Lewis, J.

_____
Stephens, J.

_____

*Greenberg et al. v. Amazon.com, Inc.*

No. 101858-4

MADSEN, J. (concurring)—I agree with the majority that the prohibition against "unfair" acts or practices under Washington's Consumer Protection Act (CPA), ch. 19.86 RCW, allows Alvin Greenberg, Michael Steinberg, Julie Hanson, Christina King, and Ronnell Robertson (plaintiffs) to bring a price gouging claim as alleged in their first amended complaint. Majority at 4; RCW 19.86.020. Accordingly, the answer to the first certified question as reformulated by this court is yes. Majority at 4. That the CPA contemplates such a claim is all that is asked of us. We need not say more. The majority, however, goes on to discuss the federal substantial injury test and holds it is one of many ways a party may show an act or practice is unfair or deceptive under the CPA. I write separately because I do not believe we should weigh in on the means by which a plaintiff shows an unfair act or practice at this point. As reformulated by this court, we are asked a question, and we have answered it. I also agree with the majority's answers to the second and third recertified questions.

The CPA declares unlawful "*unfair* or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86. 020 (emphasis added). Individual citizens may

bring private rights of actions to enforce the CPA. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784, 719 P.2d 531 (1986). To establish a CPA claim, plaintiffs must prove (1) unfair or deceptive act or practice (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff in their business or property, and (5) causation. *Id*. at 780. Only element (1) is at issue here.

Determining whether an act is unfair is a matter of law if no factual disputes exist. *Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wn.2d 820, 835, 355 P.3d 1100 (2015). The CPA "'does not define unfair or deceptive, [thus] this court has allowed the definitions to evolve through a gradual process of judicial inclusion and exclusion.'" *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 785, 295 P.3d 1179 (2013) (internal quotation marks omitted) (quoting *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 344, 779 P.2d 249 (1989)). Considering the unlimited nature of "'human inventiveness in this field,'" it is "'practically impossible to define unfair practices so that the definition will fit business of every sort in every part of this country.'" *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 48, 204 P.3d 885 (2009) (internal quotation marks omitted) (quoting *State v. Schwab*, 103 Wn.2d 542, 558, 693 P.2d 108 (1985) (Dore, J., dissenting)). Consequently, lawmakers *and courts* determine whether an act or practice is unfair or deceptive in order to accomplish the purpose of the CPA—protecting the public and fostering fair and honest competition. *Klem*, 176 Wn.2d at 786; RCW 19.86.920.

The CPA was modeled after federal consumer protection law governing, among other things, unfair, deceptive, and fraudulent acts or practices. RCW 19.86.920. While

2

Washington's CPA is akin to a mini Federal Trade Commission (FTC) Act, 15 U.S.C. § 45, federal precedent and agency orders guide but do not bind us in developing our own jurisprudence in the application of the CPA. *Klem*, 176 Wn.2d at 787; RCW 19.86.920. It is no surprise then that Washington courts have at times adopted federal law and at other times diverged from it. *See Young v. Toyota Motor Sales, U.S.A.*, 196 Wn.2d 310, 319, 472 P.3d 990 (2020) (recognizing that analogous federal consumer protection law may require showing materiality to prove the first element of a CPA claim, but Washington lawmakers did not adopt this requirement).

Plaintiffs may satisfy the first element of a private CPA claim—an unfair or deceptive act—in a number of ways. Plaintiffs may allege that an act or practice is a per se violation of a statute, has the capacity to deceive substantial portions of the public, or is in violation of the public interest. *Klem*, 176 Wn.2d at 787; *see also* 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 8:5, at 445-46 (5th ed. 2023-24). Other ways of satisfying this element include acts that are alleged to be "'unethical, oppressive, or unscrupulous,'" *Magney v. Lincoln Mut. Sav. Bank*, 34 Wn. App. 45, 57, 659 P.2d 537 (1983) (internal quotation marks omitted) (quoting *Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972)), or that cause or are likely to cause "'substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits'" to consumers or to competition. *Klem*, 176 Wn.2d at 787 (quoting 15 U.S.C. § 45(n)). In short, plaintiffs may demonstrate an unfair

3

act or practice by relying on a variety of factors, outlined in both Washington and federal law.

We have not selected a set of these factors or tested to determine what constitutes an "unfair" act or practice, and we need not do so here. *See* majority at 22-28. This case asks us only whether the CPA recognizes a claim like the one brought by the plaintiffs. It does. The plaintiffs assert that Amazon engaged in unfair acts or practices unregulated by statute in violation of the public interest. *See Klem*, 176 Wn.2d at 787 (holding that an act or practice can be unfair if it violates the public interest); majority at 27; Clerk's Papers at 63-65. There is no need to go further.

The majority, however, concludes that the plaintiffs have adequately alleged Amazon engaged in an "unfair" or deceptive act or practice under the substantial injury test. Majority at 27 ("[T]he plaintiffs adequately allege that their injuries satisfy the substantial injury test."). But nothing in the federal court's certification order, the posture of this case, or our CPA case law requires us to apply the test and decide whether it has been met. The federal court certified this case based on Amazon's motion to dismiss for failure to state a claim. Ord. Certifying Question to the Wash. Sup. Ct. at 2 (citing Fed. R. of Civ. P. 12(b)(6)). The majority's conclusion that the plaintiffs have stated a claim is all that is necessary.[1] It is up to the federal court to determine whether the plaintiffs have overcome the pleading standard.

---

[1] Applying the substantial injury test is also at odds with its federal application. As Amazon correctly points out, section 5 of the FTC Act's unfair act or practice has not "been applied to

4

Instead, I would solely hold the CPA's prohibition on "unfair" acts or practices in violation of the public interest contemplates a price gouging claim of the type alleged by the plaintiffs. *See Klem*, 176 Wn.2d at 787.

I agree with the majority's answers to the questions certified by the federal court.[2] With these considerations in mind, I respectfully concur.

_____
                              Madsen, J.

---

combat price gouging." Opening Br. of Appellant, Amazon.com, Inc. (Def.'s Br.) at 28-29. But federal consumer protection practices do not bind the decision of this court. RCW 19.86.920.

[2] I agree with Justice Gordon McCloud, however, that the answer to the first question—strictly as certified by the federal court—would be no. Dissent at 5-14, 16-20. The legislature alone has the authority to set per se violations of the CPA. *Id*. at 6. However, the legislature has provided plaintiffs with wide latitude to prove a CPA violation. Unless the legislature acts, the plaintiffs will need to prove the elements of their claim as determined by the court and guided by case law. The wisdom of reformulating federal questions may be debatable, but I agree with the majority that as reformulated the answer to the first question is yes.

No. 101858-4

KEENAN, J.[*] (concurring)—I agree with the majority in every respect and write separately to emphasize that the Consumer Protection Act (CPA), chapter 19.86 RCW, not only protects consumers but also reasonable business practices. Amazon.com Inc.'s concern that recognizing price gouging under the CPA will lead to "price controls [that] 'interfere with the market, prevent it from equalizing supply and demand, and diminish the efficiency of resource allocation'" is unwarranted. Amazon's Answer to Amicus Br. of Att'y Gen. of Wash. at 8 (quoting Amicus Curiae Br. of John B. Kirkwood (Amicus of Kirkwood) at 7). Amazon, and any business facing a claim like that presented here, has the opportunity to argue that the alleged acts were reasonable under the circumstances and thus not unfair. The CPA's statutory reasonableness defense, as codified in the countervailing benefits prong of the substantial injury test, provides this opportunity. Such a defense could be especially important in the context presented here, where the COVID-19 pandemic resulted in "unprecedented demand on internet retailers [and] led to

---

[*] Judge David Keenan is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

product scarcity online with some retailers out of stock and experiencing shipping

problems." Majority at 10 (citing Clerk's Papers at 33). Because the CPA adequately

protects business interests through the countervailing benefits prong, I concur in the

majority's opinion.

*CPA Unfairness Does Not Reach Reasonable Business Practices*

In enacting the CPA, the legislature recognized a need to broadly protect

consumers while also allowing room for businesses to grow and set prices within the law.

The legislature directed that the CPA "be liberally construed." RCW 19.86.920. That

liberal construction of the CPA's unfair acts provision prohibits unjustified price

increases, sometimes called price gouging. However, the legislature has also said that the

court's unfairness analysis should *not* reach "acts or practices which are reasonable in

relation to the development and preservation of business," where such sweep could

greatly burden businesses small and large with little or no corresponding consumer

benefit. *Id.* The court has interpreted this language to provide a "reasonableness defense

to [a] CPA claim," and such a defense could be presented in the price gouging context.

*Travis v. Wash. Horse Breeders Ass'n*, 111 Wn.2d 396, 408, 759 P.2d 418 (1988). For

example, when businesses increase prices because of increased costs, this response to

market forces can produce countervailing benefits for consumers such that there is no net

injury and thus no unfair act under the CPA.

Our case law highlights the importance of the CPA's reasonableness defense.

This court has suggested that the reasonableness language in the CPA's preamble

2

"warrants a narrower interpretation of the words 'unfair method of competition' than that given by federal courts." *State v. Black*, 100 Wn.2d 793, 803, 676 P.2d 963 (1984). Moreover, the court has noted that these words "'serve as an important guide in determining the intended effect'" of the statute. *Travis*, 111 Wn.2d at 409 (quoting *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 128, 580 P.2d 246 (1978)). Therefore, the CPA "requires courts to 'weigh the public interest in prohibiting anticompetitive conduct against the recognition that businesses need some latitude within which to conduct their trade.'" *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 54, 738 P.2d 665 (1987) (quoting *Black*, 100 Wn.2d at 803). These two CPA pillars—consumer protection and room for business development—guide Washington courts.

Federal Trade Commission (FTC) policy statements and even Amazon's own cited materials recognize that price gouging could constitute a substantial injury while also recognizing that businesses need to respond to the market. In support of its argument that the FTC Act is limited to harmful competition practices, Amazon cites the 2011 *Working Party No. 2 on Competition and Regulation—Excessive Prices United States* report (*Excessive Prices* report).[1] Reply Br. of Appellant Amazon.com, Inc. (Def.'s Reply Br.) at 9-10. The *Excessive Prices* report contains a working definition of "price gouging," which Congress directed the FTC to use when it investigated high gasoline prices in the

---

[1] DIRECTORATE FOR FIN. & ENTER. AFFS., ORG. FOR ECON. COOP. & DEV., WORKING PARTY NO. 2 ON COMPETITION AND REGULATION: EXCESSIVE PRICES (UNITED STATES), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competition-fora/1110excessivepricesus.pdf [http://perma.cc/Y8CH-JBPF]

wake of Hurricane Katrina. *Excessive Prices* report at 8 (quoting FTC, INVESTIGATION

OF GASOLINE PRICE MANIPULATION AND POST-KATRINA GASOLINE PRICE INCREASES at

iii (2006) (hereinafter Post-Katrina Report)),

https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-

investigation-gasoline-price-manipulation-and-post-katrina-gasoline-

price/060518publicgasolinepricesinvestigationreportfinal.pdf [http://perma.cc/5EAG-

SX3M]). Congress directed the FTC to "treat as evidence of price-gouging"

> any finding that the average price of gasoline available for sale to the public
> in September, 2005, or thereafter in a market area located in [a Katrina-
> affected area] . . . exceeded the average price of such gasoline in that area
> for the month of August, 2005, *unless the Commission finds substantial
> evidence that the increase is substantially attributable to additional costs in
> connection with the production, transportation, delivery, and sale of
> gasoline in that area or to national or international market trends*.

Science, State, Justice, Commerce, and Related Agencies Appropriations Act, 2006, Pub.

L. No. 109-108, § 632, 119 Stat. 2290 (2005) (emphasis added). Thus, the Post-Katrina

Report defines price gouging with exceptions for increased costs and market forces. This

is consistent with the CPA's requirement that an unfairness inquiry not reach reasonable

business development and preservation practices, which is codified in the substantial

injury test's consideration of countervailing benefits.

Amazon's concerns about the possible negative effects of price controls are well

supported. As amicus Professor John B. Kirkwood explains in this case, price controls

can "prevent prices from rising to the market-clearing level—the level that equates

demand and supply—which reduces the incentive of existing firms to expand production

and the incentive of new firms to enter the market." Amicus of Kirkwood at 9. The FTC

raised this same concern in the Post-Katrina Report, advising that price-gouging controls

> should attempt to account for the market-clearing price. Holding prices too
> low for too long in the face of temporary supply problems risks distorting
> the price signal that ultimately will ameliorate the problem. If supply
> responses and the market-clearing price are not considered, wholesalers and
> retailers will run out of gasoline and consumers will be worse off.

Post-Katrina Report at 197. However, the substantial injury test adequately accounts for

these concerns. The test reflects that price increases can be unfair, but it also prompts the

fact finder to analyze whether a price increase is attributable to cost increases and

whether the price change equalizes supply and demand in the market. If the net effect is

positive for consumers, the price increase might not amount to a substantial injury

warranting a CPA unfairness finding.

Therefore, the substantial injury test satisfies the CPA's stated purpose of broadly

protecting consumers, while *not* reaching reasonable business conduct in the absence of a

net injury to the public. RCW 19.86.920. Specifically, the CPA's reasonableness

defense is codified in the substantial injury test's countervailing benefits prong, which

requires a fact finder to analyze factors such as increased costs within the distribution

chain, the burden on business, and the need for market forces to help set supply and

demand. Fact finders may consider these factors when determining whether there has

been a net injury, and a trial court may properly instruct a jury as to this reasonableness

defense where sufficient evidence supports the instruction. *Travis*, 111 Wn.2d at 409

("The reasonableness defense raised by the sellers' instruction correctly states the law. It

was error for the trial court to refuse to give it.").  This court has held that "[w]here conduct is motivated by legitimate business concerns, there can be no violation of RCW 19.86."  *Boeing*, 108 Wn.2d at 54.  These countervailing benefits considerations will assist courts and juries to ensure that businesses are not overburdened when they set their prices in ways that benefit, rather than injure, consumers.

Therefore, I respectfully concur with the majority's answers to the certified questions.

_____
Keenan, J.P.T.

_____
Yu, J.

_____
Montoya-Lewis, J.

No. 101858-4

GORDON McCLOUD, J. (dissenting)—The Washington Consumer

Protection Act (CPA or WCPA) makes it unlawful to use "[u]nfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or

commerce." RCW 19.86.020. The federal district court has certified two questions

to this court regarding this statute's meaning.

First, the federal court asks whether the CPA covers the type of price

gouging[1] claim alleged in the first amended complaint. Ord. Certifying Question to

Wash. Sup. Ct. (Order) at 9. That complaint alleges that "a price increase of 15%

---

[1] "Price gouging" lacks a formal accepted definition but is "widely understood to refer to significant price increases (typically during periods of unusual market conditions)." FED. TRADE COMM'N, INVESTIGATION OF GASOLINE PRICE MANIPULATION AND POST-KATRINA GASOLINE PRICE INCREASES (Spring 2006) at iii, https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-investigation-gasoline-price-manipulation-and-post-katrina-gasoline-price/060518publicgasolinepricesinvestigationreportfinal.pdf [http://perma.cc/5EAG-SX3M]; *see also White v. R.M. Packer Co.*, 635 F.3d 571, 588 (1st Cir. 2011) (explaining that price gouging rules "are generally designed to protect consumers from acute and unconscionable increases in the prices they must pay for basic consumer goods during times of market emergency").

1

on any consumer good or food item after a declared emergency is 'unfair' for purposes of the WCPA." Clerk's Papers (CP) at 64, ¶¶ 144-145. In other words, Alvin Greenberg, Michael Steinberg, Julie Hanson, Christina King, and Ronnell Robertson (plaintiffs) frame their claim around the assumption that the CPA's broadly worded ban on unfair acts or practices categorically bars certain percentage increases in the price of certain essential goods after a declared emergency.

If we answer the first certified question yes, the federal district court asks us to decide whether the court or the jury determines "what percentage increase in the price of goods is 'unfair' for purposes of the statute." Order at 9.

I would answer no to the first certified question. Nothing in the text or context of the CPA, or in the decisions that the CPA tells us to consider when interpreting the CPA, suggests that a postemergency price increase of 15 percent or any other set percentage—without consideration of other market forces and without listing any defenses—is categorically "unfair."

The majority actually agrees on this point. But the majority splits the first certified question into two questions in order to opine about general price increase claims that the plaintiffs haven't alleged. I disagree with the majority's decision to do that, and I disagree with the breadth of the majority's statements on its

2

rewritten, far broader first question. I do not think that we should be the first court in the nation to create a price gouging claim based on general statutory language prohibiting "unfair . . . acts" in trade or commerce. The decision about whether to create such a claim and whether to include other market-based elements or defenses should be based on economic policy considerations; weighing those numerous, difficult, competing considerations is the job of the legislature, not the courts.

Because I would answer the first certified question no, I would decline to reach the second certified question—the one about who determines whether price gouging of 15 percent or any other set percentage is unfair. And I fear that the majority's holding, which places that legal decision in the hands of the jury when underlying facts are disputed, conflicts with controlling precedent and will lead to inconsistent and unfair results. Instead, I would adopt the answer to that question advanced by amicus Attorney General of Washington: follow controlling precedent placing such legal decisions in the hands of the court and thereby foster uniformity, clarity, and consistency in results.

I therefore respectfully dissent.

FACTS AND PROCEDURAL HISTORY

The plaintiffs purchased essential food and safety items on Amazon.com during the COVID-19 pandemic. Those items cost far more than they had cost just before the federally declared COVID-19 emergency.

Plaintiffs sued Amazon in federal district court and alleged negligence, unjust enrichment, and violations of the CPA "on behalf of a global class of Amazon.com customers who made purchases at prices at least 15% higher than they were on January 31, 2020, when the U.S. Department of Health and Human Services declared a national emergency related to COVID-19." *Id.* at 1. Amazon moved to dismiss on the ground that the CPA does not regulate price gouging.

The district court certified two questions to this court regarding the plaintiffs' CPA claim:

> Does the Washington Consumer Protection Act's prohibition on "unfair" acts or practices comprehend a price gouging claim of the type alleged in the First Amended Complaint?
>
> If yes, does the Court or the jury determine what percentage increase in the price of goods is "unfair" for purposes of the statute?

*Id.* at 2.[2]

---

[2] We accepted certification and received briefing from both parties. We also accepted briefing from numerous amici: Professor John B. Kirkwood of Seattle

ANALYSIS

I.     The answer to the first certified question is no, the CPA's bar on
       unfair business practices does not categorically bar a postemergency
       price increase of 15 percent or any other set percentage

The state legislature modeled the CPA on the Federal Trade Commission

(FTC) Act, 15 U.S.C. § 45, and federal antitrust law. Indeed, the CPA's prohibition

on unfair acts and practices repeats section 5 of the FTC Act nearly verbatim.

Underscoring the legislature's decision to base the CPA on that body of

federal law, the legislature also directed courts construing the CPA's language to

be "guided by final decisions of the federal courts and final orders of the [FTC]

interpreting the various federal statutes dealing with the same or similar matters."

RCW 19.86.920.

No FTC guidance or federal precedent has ever interpreted the prohibition of

"unfair" practices in the FTC Act to categorically bar a postemergency price

increase of 15 percent or of any other set percentage. No FTC guidance or federal

precedent has ever applied the FTC Act or related federal laws to price gouging at

all. And the states that do impose percentage-based limits on postemergency price

---

University School of Law, the Association of Washington Business, the United
States Chamber of Commerce, the National Retail Federation, and our attorney
general.

5

increases do so through specific legislation directed at price gouging or through agency regulation—not through the generally worded ban on unfair business practices found in state consumer protection laws.

As explained below, I would therefore answer the first certified question no. In fact, I believe that if the majority had answered the question as posed by the federal district court, rather than rewriting it, then the majority would have also answered that first certified question no. The reason is that the majority clearly opines that reading a categorical bar on price increases of a set percentage into the CPA would invade the province of the legislature. Majority at 42-43.

> A. The state legislature has directed the courts to consider FTC orders and federal court decisions interpreting federal statutes dealing with similar issues when interpreting the CPA

The first certified question presents an issue of statutory interpretation: does a price increase of a set percentage—here, 15 percent—on any consumer good or food item following a declared emergency constitute an "unfair" business practice under the CPA?

When we interpret a statute, our "fundamental objective is to ascertain and carry out the Legislature's intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). We begin with "the plain language enacted by the legislature, considering the text of the provision in question, the context of the

6

statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole." *Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd.*, 182 Wn.2d 342, 350, 340 P.3d 849 (2015) (citing *Campbell & Gwinn, LLC*, 146 Wn.2d at 9-10).

We must therefore start with the text of the CPA. It states, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020.[3]

The CPA does not provide a definition of "unfair" or "deceptive." But the context of the CPA provides guidance for interpreting the scope of those words.

---

[3] Under our case law, a CPA claim requires proof of five elements: "'(1) [an] unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff in his or her business or property, [and] (5) causation.'" *Berkshire Hathaway Homestate Ins. Co. v. SQI, Inc.*, 132 F. Supp. 3d 1275, 1294 (W.D. Wash. 2015) (alterations in original) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986)). The first element can be satisfied in two ways: by showing that "a statute which has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce has been violated," *Hangman Ridge*, 105 Wn.2d at 786, or by showing that the defendant has engaged in "an unfair or deceptive act or practice not regulated by statute but in violation of public interest." *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787, 295 P.3d 1179 (2013). Here, plaintiffs have alleged the latter type of claim: an unfair trade practice that is not a per se violation of a statute.

The legislature enacted the CPA in 1961. The legislature modeled the CPA after federal consumer protection and antitrust laws: the FTC Act, the Sherman Antitrust Act of 1890,[4] and the Clayton Antitrust Act of 1914.[5] Julian C. Dewell & D. Wayne Gittinger, *Antitrust: The Washington Antitrust Laws*, 36 WASH. L. REV. & ST. B.J. 239, 251-55 (1961); *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 204 P.3d 885 (2009). Indeed, RCW 19.86.020's bar on "unfair or deceptive acts or practices in the conduct of any trade or commerce" was copied "virtually verbatim" from section 5 of the FTC Act.[6] *State v. Reader's Dig. Ass'n*, 81 Wn.2d 259, 275, 501 P.2d 290 (1972), *modified by Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 786, 719 P.2d 531 (1986).

Underscoring this link to federal law, the Washington legislature gave the courts specific direction on how to interpret the CPA: the legislature stated that courts should "be guided by final decisions of the federal courts and final orders of the [FTC] interpreting the various federal statutes dealing with the same or similar

---

[4] 26 Stat. 209, *as amended*, 15 U.S.C. §§ 1-8 (1958).

[5] 38 Stat. 730, *as amended*, 15 U.S.C. §§ 12-27 (1958), 29 U.S.C. § 52 (1958).

[6] *See* 15 U.S.C. § 45(1)(a) ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.")

8

matters." RCW 19.86.920. This serves the CPA's purpose, which is "to

complement the body of federal law governing restraints of trade, unfair

competition and unfair, deceptive, and fraudulent acts or practices in order to

protect the public and foster fair and honest competition." *Id.* The legislature

directed courts to interpret the CPA liberally to fulfill this purpose. *Id*.

Because the CPA does not define "unfair" or "deceptive," courts have

interpreted the scope of those terms over time. *Klem*, 176 Wn.2d at 785 (quoting

*Saunders v. Lloyd's of London*, 113 Wn.2d 330, 344, 779 P.2d 249 (1989) (quoting

*Reader's Dig.*, 81 Wn.2d at 275)). When considering claims of unfair or deceptive

practices that are not per se statutory violations, this court has repeatedly

acknowledged and followed the legislative directive to seek guidance from FTC

orders and federal court decisions interpreting relevant federal laws. *See Panag*,

166 Wn.2d at 48; *Klem*, 176 Wn.2d at 787; *Reader's Dig.*, 81 Wn.2d 259. I would

follow the same approach in this case.

> B. Neither the FTC nor the federal courts have interpreted the FTC
>    Act or related antitrust laws to cover price gouging

It is undisputed that the FTC Act "has never been applied to combat price

gouging." Craig Carpenito et al., *The Federal Response To Hoarding and Price*

9

*Gouging during the COVID-19 Pandemic*, 30 PUB. LAW. 8, no. 2 (2022).[7] And

federal courts interpreting the antitrust laws on which other portions of the CPA

are based have never held that those federal laws cover price gouging claims

either. *E.g.*, *Whitaker Cable Corp. v. Fed. Trade Comm'n*, 239 F.2d 253, 256 (7th

Cir. 1956) (Clayton Act is not a "price control law"); *Blue Cross & Blue Shield*

*United v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995) ("[T]he antitrust

laws are not a price-control statute."); *Gutierrez v. Bean*, 2006 WL 4117064, at \*4

(D.N.M. Dec. 13, 2006) (court order) ("[T]here is no general claim under the

federal antitrust statutes for price gouging.").[8]

---

[7] Available at
https://www.americanbar.org/groups/government_public/publications/public-lawyer/2022-summer/the-federal-response-hoarding-and-price-gouging-during-covid19-pandemic/ (last visited July 26, 2024). The majority cites this article for the proposition that "no federal law" prohibits price gouging. Majority at 6. However, the article says that while the FTC Act does not cover price gouging, the Department of Justice relied on a provision in the Defense Production Act to prosecute alleged price gougers during the pandemic. Carpenito, et al., *supra* (citing 50 U.S.C. § 4512). That provision bars any person from accumulating designated scarce materials "for the purpose of resale at prices in excess of prevailing market prices." 50 U.S.C. § 4512.

[8] This case is cited as persuasive authority under GR 14.1(b), which permits the citation of pre-2007 unpublished federal decisions as persuasive authority as long as the issuing court so permits. The District of New Mexico follows the Tenth Circuit's rule 32.1(A) allowing citation of unpublished opinions for their

Indeed, the consensus appears to be that there is no "comprehensive federal legislation addressing price gouging" at all. Carpenito, et al., *supra*, at 8; *Fed. Trade Comm'n v. Lundbeck, Inc.*, 2010 WL 3810015, at \*4 (D. Minn. Aug. 31, 2010), *aff'd*, 650 F.3d 1236 (8th Cir. 2011) (FTC stated at oral argument that "'[t]here is no U.S. law against price gouging'" (alteration in original)); FTC, INVESTIGATION OF GASOLINE PRICE MANIPULATION AND POST-KATRINA GASOLINE PRICE INCREASES at iii (FTC POST-KATRINA REPORT);[9] CONGRESSIONAL RESEARCH SERVICES, GASOLINE PRICE INCREASES: FEDERAL AND STATE AUTHORITY TO LIMIT "PRICE GOUGING" at 1 (CRS, GASOLINE PRICE INCREASES).[10]

---

persuasive value. *See Macias v. Sw. Cheese Co., LLC*, 2014 WL 11429076, at \*3 (D.N.M. June 11, 2014), *aff'd*, 624 Fed. App'x 628 (10th Cir. 2015).

[9] https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-investigation-gasoline-price-manipulation-and-post-katrina-gasoline-price/060518publicgasolinepriceinvestigationreportfinal.pdf [http://perma.cc/5EAG-SX3M]

[10] https://www.crsreports.congress.gov/product/pdf/R/R47072 [http://perma.cc/HZ5E-ZSTP]. As discussed *supra* note 2, 50 U.S.C. § 4512 prohibits hoarding of specifically designated "scarce materials" for the purpose of reselling at an excessive price. However, that provision is applicable only when the President triggers their authority under the Defense Production Act and designates specific materials are scarce and critical to national defense, among other requirements. 50 U.S.C. § 4512. Therefore, that statute does not constitute a comprehensive, widely applicable anti-price-gouging statute.

In fact, the FTC has consistently expressed the opinion that price control

laws are harmful because they run counter to fundamental free market principles.

*E.g.*, FTC POST-KATRINA REPORT at 183 ("[I]f there is a 'right' price for a

commodity, it is not necessarily the low price; rather, it is the competitively

determined market price.")

The majority gives no weight to the fact that these federal authorities have

never held that the FTC Act or the antitrust laws cover price gouging claims.

Instead, the majority simply assumes that such claims fall within the scope of the

CPA. Majority at 22. [11]

The majority then holds that Washington courts must use the FTC Act's

substantial injury test[12] to determine whether a business act or practice is "unfair"

---

[11] This court has previously held that some types of claims fall outside the scope of the CPA as a matter of law, despite the CPA's broad language. *E.g.*, *Short v. Demopolis*, 103 Wn.2d 52, 61, 691 P.2d 163 (1984) (negligence claims against legal professionals are "outside the purview of the CPA"); *Michael v. Mosquera-Lacy*, 165 Wn.2d 595, 603, 200 P.3d 695 (2009) (same for negligence claims against medical professionals (citing *Quimby v. Fine*, 45 Wn. App. 175, 180, 724 P.2d 403 (1986))); *see also Ramos v. Arnold*, 141 Wn. App. 11, 20, 169 P.3d 482 (2007) (same for negligence claims against appraisers). The majority dismisses these cases as inapposite. Majority at 33-35. It is certainly true that these cases do not interpret the meaning of "unfair." But they show by analogous reasoning that the CPA's reach is not limitless.

[12] The substantial injury test, found at 15 U.S.C. § 45(n), provides, "The [FTC] shall have no authority under this section . . . to declare unlawful an act or

under the CPA. The majority claims that in doing so, it "is not inventing a new standard but, rather, applying decades old precedent established by the FTC itself." Majority at 33.

But the FTC has never applied that precedent to price gouging claims because neither the FTC Act nor the antitrust laws regulate price gouging. My research has shown no federal or state court has applied the substantial injury test to a price gouging claim under a generally worded consumer protection law either. Thus, the majority's decision to apply the substantial injury test to the price gouging context *is* new. And I respectfully suggest that the majority fails to sufficiently explain why we should adopt this test and expand it to a novel context for which it was never developed and to which it has never been applied.

In sum, the sources that the legislature directed courts to consult in determining whether an act or practice is "unfair" provide no support for the plaintiffs' assertion that the legislature intended the CPA to cover plaintiffs' claim

---

practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the [FTC] may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination."

that a price increase of 15 percent—or any other set percentage—following a declared emergency automatically constitutes an "unfair" act or practice. And those sources provide no support for the majority's assertion that the legislature intended for courts to use the federal substantial injury test to determine whether a claim of price gouging—whether based on a set percentage increase or not—constitutes an "unfair" act or practice under the CPA.

> C. Every other state that regulates price gouging does so via specific legislation or agency regulation pursuant to delegated legislative authority

Of course, we are not bound by federal authority interpreting federal laws when interpreting our CPA. *Panag*, 166 Wn.2d at 47. We are free to develop our own CPA jurisprudence. *Klem*, 176 Wn.2d at 787. In doing so, we have previously considered the decisions of other state courts on similar consumer protection topics. *Panag*, 166 Wn.2d at 50.

Many states regulate price gouging. But *every* state that regulates price gouging does so via (1) specific legislation targeting price gouging or (2) specific agency regulation targeting price gouging. *See* CRS, GASOLINE PRICE INCREASES at 1-3; NAT'L CONSUMER L. CTR., CONSUMER PROTECTION IN THE STATES: A 50-STATE EVALUATION OF UNFAIR AND DECEPTIVE PRACTICES LAWS (2018) (NCLC,

14

50-STATE EVALUATION).[13] I can find no case where a state court interpreted its generally worded consumer protection statute to cover price gouging claims.

Washington's legislature has not passed a specific anti-price-gouging statute and Washington's CPA does not delegate rule making authority to an agency. John J. O'Connell, *Washington Consumer Protection Act—Enforcement Provisions and Policies*, 36 WASH. L. REV. & ST. B.J. 279, 280-81 (1961). Notably, our legislature attempted to pass an anti-price-gouging statute in 2021. ESSB 5191[14] would have banned the sale or rental of certain covered goods at an "excessive price" during a state of emergency. The bill defined "excessive price" as "a price more than 15 percent greater than the price at which the person sold, rented, or offered to sell or rent the same product or service immediately prior to the state of emergency." H.B. REP. ON ESSB 5191, at 3, 67th Leg., Reg. Sess. (Wash. 2021). The bill would have made a violation a per se unfair or deceptive act for CPA purposes. And the bill would have created an express defense for price increases attributable to additional costs imposed by a supplier or other costs of providing the good or service. *Id.*

---

[13] https://www.nclc.org/wp-content/uploads/2022/09/UDAP_rpt.pdf [http://perma.cc/E9UG-64Z7]

[14] ENGROSSED SUBSTITUTE SENATE BILL 5191, 67th Leg., Reg. Sess. (Wash. 2021).

But—as the majority acknowledges—the bill failed. Majority at 39.

To be sure, the legislature's failure to pass this bill does not answer the statutory interpretation question before us. But it demonstrates why legislation is generally the appropriate way to make policy decisions about excessive pricing. ESSB 5191 was detailed and specific: its clear definitions and express defense provided notice to businesses (small as well as large) and to consumers about what conduct violates the law. This is in line with other states' similar, detailed, prospective legislation. *E.g.*, CAL. PENAL CODE § 396.

> D. Interpreting the CPA's bar on unfair practices as categorically barring a price increase of 15 percent—or any other set percentage—following a declared emergency impermissibly rewrites the statute and intrudes on the legislature's power

A basic principle of statutory interpretation is that "a court must not add words where the legislature has chosen not to include them." *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003). As the majority correctly acknowledges, "'we must avoid stepping into the role of the Legislature by actively creating the public policy of Washington,'" since it is "'primarily a legislative, and not a judicial, function to determine economic policy.'" Majority at 42 (quoting *Sedlacek v. Hillis*, 145 Wn.2d 379, 390, 36 P.3d 1014 (2001); *State v. Sears*, 4 Wn.2d 200, 207, 103 P.2d 337 (1940)).

Interpreting the CPA as containing a bright line rule that postemergency price increases of 15 percent—or any other set percentage—automatically constitute an "unfair" business practice violates both rules. I therefore agree with the majority's holding that a price increase of 15 percent or more on any consumer good or food item during a declared emergency is not categorically "unfair" under our CPA. Majority at 43.

The majority, however, goes further. It also holds that the CPA covers case-by-case claims of price gouging, such as the claim it reads into the first amended complaint. *Id.* at 41.

But the separation of powers principles the majority cites apply with equal force to case-by-case price gouging claims. Both types of claims "entail[] numerous social and economic considerations" and are therefore "best left to the legislature." Majority at 43. Those significant policy questions include the types of goods and/or services covered; the type of emergency that triggers liability; the baseline measuring point for the preemergency price (especially in this era of surge or dynamic pricing); the types of defenses or exceptions available; and whether this extension of the CPA is advisable, given its likely impact on small businesses,

which represent the majority of businesses in Washington and the majority of minority-owned businesses.[15]

The majority declines to address these complex issues. It fails to recognize the role of market forces in shaping prices and whether that should affect the elements of the plaintiffs' new price gouging claim. And it fails to mention any defenses to its new price gouging claim, even though nearly every state with an anti-price-gouging law explicitly provides a defense based on increased costs passed on to the retailer. *See* CRS, GASOLINE PRICE INCREASES at 1-3; NCLC, 50-STATE EVALUATION. As the concurrence points out, Washington's CPA does provide a general "reasonable business conduct" defense that should play an important role in future cases. Concurrence at 5 (Keenan, J. Pro Tem.) (citing *Travis v. Wash. Horse Breeders Ass'n*, 111 Wn.2d 396, 409, 759 P.2d 418 (1988);

---

[15] In 2023, 99.5 percent of businesses in Washington were small businesses, defined as a business with fewer than 500 employees. U.S. SMALL BUS. ADMIN., 2023 SMALL BUSINESS PROFILE: WASHINGTON, https://advocacy.sba.gov/wp-content/uploads/2023/11/2023-Small-Business-Economic-Profile-WA.pdf [http://perma.cc/A97F-27MV]; Br. of Amicus Curiae Ass'n of Wash. Business at 7-8. Nationwide, 99.9 percent of businesses owned by minorities are small businesses. U.S. SMALL BUS. ADMIN., SPOTLIGHT ON MINORITY-OWNED EMPLOYER BUSINESSES (nationwide statistic for 2019), https://advocacy.sba.gov/wp-content/uploads/2019/05/Small-Business-Facts-Spotlight-on-Minority-Owned-Employer-Businesses.pdf?utm_medium=email&utm_source=govdelivery [http://perma.cc/A288-9QLF].

RCW 19.86.920; *see also Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 54, 738

P.2d 665 (1987) ("Where conduct is motivated by legitimate business concerns,

there can be no violation of RCW 19.86." (citing *State v. Black,* 100 Wn.2d 793,

802-03, 676 P.2d 963 (1984))). But the majority doesn't mention this statutory

defense at all.[16]  And neither the majority nor the Keenan concurrence explain why

basic market forces should be considered only in shaping defenses, rather than in

creating the elements of the claim.

Instead, the majority simply asserts without citation that failing to extend the

CPA to cover price gouging would conflict with the CPA's intent to "'protect the

public.'" Majority at 33 (quoting RCW 19.86.920).

But it's more complicated than that. The majority cites no evidence that anti-

price-gouging statutes do, in fact, protect the public. And there is certainly a split

of opinion on this policy matter.  In fact, many economists oppose such statutes, as

---

[16] As the concurrence observes, facts relevant to this defense are properly considered under the "countervailing benefits" prong of the substantial injury test. Factors relevant to whether a business practice is reasonable include "factors such as increased costs within the distribution chain, the burden on business, and the need for market forces to help set supply and demand." Concurrence at 5 (Keenan, J. Pro Tem.). But the majority does not address these factors or why they should be placed in a defense, rather than in the elements, of a price gouging claim.

recognized by some of the majority's own cited sources. *See, e.g.*, majority at 6

(quoting Michael Brewer, *Planning Disaster: Price Gouging Statutes and the*

*Shortages They Create*, 72 BROOK. L. REV. 1101, 1113 (2007) (arguing that price

control measures tend to exacerbate shortages and misallocate supply)).

As the United States Supreme Court has recognized, courts are simply not

equipped to make such complex economic policy decisions. Instead, courts are

"institutionally unsuited to gather the facts upon which economic predictions can

be made, and professionally untrained to make them." *Gen. Motors Corp. v. Tracy*,

519 U.S. 278, 308, 117 S. Ct. 811, 136 L. Ed. 2d 761 (1997). At least I'm

professionally untrained to make them.

The answer to the district court's first certified question should be no.

> E. The majority errs in splitting the first certified question into two
> questions and then opining about claims not actually alleged

When presented with federal certified questions, "we do not seek to make

broad statements outside of the narrow questions and record before us." *Ruiz-*

*Guzman v. Amvac Chem. Corp.*, 141 Wn.2d 493, 508, 7 P.3d 795 (2000) (citing

*Crossler v. Hille*, 136 Wn.2d 287, 289, 961 P.2d 327 (1998)). The reason is that

this court "lacks jurisdiction to go beyond the question certified." *Broad v.*

*Mannesmann Anlagenbau, A.G.*, 141 Wn.2d 670, 676, 10 P.3d 371 (2000) (citing

*Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 577, 964 P.2d 1173 (1998);

*Shumway v. Payne*, 136 Wn.2d 383, 391, 964 P.2d 349 (1998)).

To be sure, this court has the power to rewrite a certified question to make it clearer, organized, or to the point. *Id.*

But the majority's rewrite of the first certified question does not do that. Instead, the rewrite greatly expands the certified question's scope. As stated above, that first certified question asks whether the CPA's "prohibition on 'unfair' acts or practices comprehend[s] a price gouging claim *of the type alleged in the First Amended Complaint*." Order at 9 (emphasis added). The first amended complaint alleges the following under the heading "First Cause of Action – Violation of [WCPA]":

> 144. As set forth herein, Amazon violated the WCPA by charging consumers grossly inflated and thus "unfair" prices during the COVID-19 pandemic.
>
> 145. For purposes of this First Amended Complaint, Plaintiffs allege that a price increase of 15% on any consumer good or food item after a declared emergency is 'unfair' for purposes of the WCPA.

CP at 64. This CPA claim is based on a set percentage increase (15 percent) without consideration of other market factors.

The majority, however, reads the first amended complaint as raising two separate CPA claims—one non-percentage-based claim and one percentage-based

21

claim (despite the fact that paragraphs 144 and 145 appear under the single CPA cause of action). The majority asserts that only the class-based claims "depend[] on whether a price increase crosses a certain percentage threshold." Majority at 3. The majority accepts the plaintiffs' assertion "that the 15 percent figure is immaterial at this juncture and only relevant for class certification." *Id.* (citing Answering Br. of Appellees (Pls.' Br.) at 18-22).

I disagree. The set percentage increase alleged in the complaint is not immaterial—a set percentage increase, in this case an increase of 15 percent, forms the core of the plaintiffs' claim. The wording of the district court's second certified question suggests that the federal court interpreted the complaint to raise a categorical, set percentage-based claim, too. The majority's rewrite ignores the fact that plaintiffs raised only one CPA claim, that they made that claim based on a set percentage price increase without consideration of other market forces, and that they did not raise a fallback general CPA claim of whatever sort this court might fashion.

I therefore disagree with the majority's decision to rewrite the first certified question in the way that it has. The rewritten question expands the scope of the federal court's inquiry, strays from the actual allegations in the complaint, and compels the majority to opine on major policy issues that are not before us.

22

II.     The judge, not the jury, should determine as a matter of law whether an alleged act or practice is "unfair" under the CPA

Because I would answer the first certified question no, I would decline to reach the second, contingent question—whether the judge or the jury decides if price gouging of 15 percent or any other set percentage is "unfair."

The majority reformulates the second question to ask whether "the court or the jury determine[s] when an alleged claim of 'price gouging' constitutes an unfair trade practice under the CPA." Majority at 4. It answers that question by holding that "in the context of case-specific claims of unfairness, the court decides whether an act or practice is unfair if the underlying facts are not in dispute, and where the underlying facts are disputed, a jury decides the matter." *Id.* at 54.

The majority is certainly correct that in a case with no disputed material facts and only a question of law, the court makes the decision on the question of law; in a case with some disputed material facts (with or without a disputed question of law), the jury makes the decision on the questions of fact. *E.g.*, *Wash. Imaging Servs., LLC v. Dep't of Revenue*, 171 Wn.2d 548, 555, 252 P.3d 885 (2011); *Davis v. Cox*, 183 Wn.2d 269, 289, 351 P.3d 862, (2015), *abrogated in part on other grounds by Maytown Sand & Gravel, LLC v. Thurston County*, 191

23

Wn.2d 392, 440 n.15, 423 P.3d 223 (2018), *abrogated in part on other grounds by*

*Chong Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019).

But the majority is saying more than that. It holds that in any case with

disputed facts, the legal question of unfairness becomes a mixed question of law

and fact for a jury to decide. Majority at 43.

I disagree. Under our controlling precedent, "[w]hether a party *in fact*

committed a particular act" is a question for the fact finder, but the "determination

of whether a particular statute *applies* to a factual situation is a conclusion of law."

*Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 149-50, 930 P.2d

288 (1997). Thus, the question whether particular conduct "constitutes an unfair or

deceptive act" under the CPA is a question of law. *Id*. We have consistently

reaffirmed that precedent. *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 30, 948 P.2d

816 (1997); *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162

Wn.2d 59, 74, 170 P.3d 10 (2007); *Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wn.2d 820,

835, 355 P.3d 1100 (2015); *Young v. Toyota Motor Sales, U.S.A.*, 196 Wn.2d 310,

317, 472 P.3d 990 (2020); *Panag*, 166 Wn.2d at 47.

I would reaffirm that precedent once again and hold, as amicus attorney

general urges, that unfairness is a question of law determined by the court and that

"a jury in a private CPA action is only required if there are disputed factual

24

questions that must be decided before the court can reach the legal question of 'unfairness.'" Br. of Amicus Curiae Att'y Gen. of State of Wash. at 6.

Thus, I agree with the majority that where facts are undisputed, whether an act or practice is unfair under the CPA is a question of law for the court. But I disagree with the remainder of the majority's discussion and its holding that where underlying facts are disputed, the issue of unfairness becomes a mixed question of law and fact for the jury. That result is not supported by our precedent.

The majority relies on a sentence from *Delgado Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 32 P.3d 250 (2001), for its conclusion that unfairness can be a mixed question of law and fact appropriate for a jury. Majority at 49. The majority is certainly correct that some issues present a mixed question of fact and law, and that such questions "'may be submitted to a jury under proper instructions.'" Majority at 50 (quoting *Anfinson v. FedEx Ground Package Sys., Inc.*, 159 Wn. App. 35, 72, 244 P.3d 32 (2010) (quoting *Zurfluh v. Lewis County*, 199 Wn. 378, 381, 91 P.2d 1002 (1939), *overruled in part on other grounds by Portland-Seattle Auto Freight v. Jones*, 15 Wn.2d 603, 131 P.2d 736 (1942))). But we have never before treated the issue of unfairness under the CPA as a mixed question of law and fact. And in my view, the sentence from *Guijosa* does not

25

support the majority's conclusion that unfairness can be a mixed question of law

and fact.

In *Guijosa*, plaintiffs claimed that Wal-Mart committed a per se unfair or

deceptive act or practice because it discriminated against them in violation of the

Washington Law Against Discrimination, ch. 49.60 RCW. 144 Wn.2d at 915.  The

parties disputed the underlying conduct. Following trial, the court instructed the

jury that if it found Wal-Mart liable for discrimination, then the first three elements

of a claim for violation of the CPA were necessarily satisfied. *Id.* at 918. The jury

returned a verdict that Wal-Mart had not discriminated against the plaintiffs—but it

also returned a verdict that Wal-Mart violated the CPA. The trial court granted the

defendants' motion for judgment as a matter of law under CR 50(b). We affirmed.

We explained that because "the only basis presented by plaintiffs at trial for

finding" a CPA violation was discrimination, the record lacked sufficient evidence

to support the jury's verdict that Wal-Mart violated the CPA. *Id.* at 922. In passing,

we stated that while "the jury was free to determine what could constitute an unfair

and deceptive act or practice, there was simply none asserted or claimed, other than

discrimination." *Id.* at 921.

I agree with Amazon that in context, "this statement clearly means that the

jury was 'free to determine' based on the facts at trial whether any unfair or

deceptive act had actually occurred." Def.'s Br. at 60. *Guijosa* did not say that

where facts are disputed in an "unfairness" claim, the jury also gets to decide as a

matter of law what constitutes "unfairness." On the contrary, the fact that this court

affirmed the judgment in favor of Wal-Mart "*despite* the jury's finding of CPA

liability confirms that the jury was *not* free to define for itself what practices were

unfair." *Id.* at 61. And since *Guijosa*, we have continued to reaffirm *Leingang*'s

holding that unfairness constitutes a question of law. *See, e.g.*, *Panag*, 166 Wn.2d

at 47; *Trujillo*, 183 Wn.2d at 835; *Young*, 196 Wn.2d at 317.

I therefore disagree with the majority's decision to elevate *Guijosa*'s

"passing statement" into a holding that any CPA unfairness claim involving

disputed facts becomes a mixed question of law and fact for a jury. Majority at 44.

I would reaffirm our long-standing distinction "between genuine disputes of

material fact and the separate, purely legal question of whether conduct is unfair or

deceptive." Br. of Amicus Curiae Att'y Gen. of State of Wash. at 27. The

majority's contrary holding conflicts with controlling precedent and will lead to

inconsistent and unfair results.

27

CONCLUSION

I would not reformulate the first certified question or opine on a claim not actually alleged by plaintiffs. I would answer the first certified question no, so I would not reach the second, contingent certified question.

But I also disagree with the majority's answer to that second question. I would answer that second question as amicus attorney general does in its briefing to this court:  by reaffirming our precedent that the judge, not the jury, decides questions of law like whether the CPA bars the 15 percent price increase claim alleged by plaintiffs.

I therefore respectfully dissent.

_____
Gordon McCloud, J.

_____
Johnson, J.